*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 07a0290p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

PATRICIA DENHOF (05-1819/1904) and RENEE
LECLEAR (05-1820/1904),

*Plaintiffs-Appellants/
Cross-Appellees,*

Nos. 05-1819/1820/1904

*v.*

CITY OF GRAND RAPIDS,

*Defendant-Appellee/
Cross-Appellant.*

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 02-00275—Gordon J. Quist, District Judge.

Argued: October 31, 2006

Decided and Filed: February 28, 2007[*]

Before: MERRITT and BATCHELDER, Circuit Judges; GWIN, District Judge.[**]

---

### COUNSEL

**ARGUED:** Stuart N. Dowty, PITT, McGEHEE, MIRER, PALMER & RIVERS, Royal Oak, Michigan, Christine A. Yared, LAW OFFICE, Grand Rapids, Michigan, for Appellants. G. Douglas Walton, NANTZ, LITOWICH, SMITH & GIRARD, Grand Rapids, Michigan, for Appellee. **ON BRIEF:** Michael L. Pitt, PITT, McGEHEE, MIRER, PALMER & RIVERS, Royal Oak, Michigan, Christine A. Yared, LAW OFFICE, Grand Rapids, Michigan, for Appellants. G. Douglas Walton, NANTZ, LITOWICH, SMITH & GIRARD, Grand Rapids, Michigan, Marcelyn A. Stepanski, JOHNSON, ROSATI, LaBARGE, ASELTYNE & FIELD, Farmington Hills, Michigan, for Appellee.

MERRITT, J., delivered the opinion of the court, in which GWIN, D. J., joined. BATCHELDER, J. (pp. 14-15), delivered a separate dissenting opinion.

---

[*] This decision was originally issued as an "unpublished decision" filed on February 28, 2007. The court has now designated the opinion as one recommended for full-text publication.

[**] The Honorable James S. Gwin, United States District Judge for the Northern District of Ohio, sitting by designation.

---

## OPINION

---

MERRITT, Circuit Judge. In this employment retaliation case under Title VII and Michigan state law, plaintiffs-appellants Patricia Denhof and Renee LeClear appeal the District Court's order granting the defendant's alternative motions for judgment as a matter of law under Rule 50, Fed. R. Civ. P.,[1] a new jury trial under Rule 59, Fed. R. Civ. P.[2] and for a substantial common law remittitur of the compensatory damages awarded by the jury.[3] Grand Rapids also cross-appeals six decisions of the district court, primarily related to evidentiary issues and damage computations. For the reasons discussed below, we reverse the district court's alternative orders granting judgment as a matter of law for the defendant and a new jury trial. We affirm the grant of remittitur. We also affirm the district court's decisions on each of the defendant's six cross-appeals.

### I. Background

This case turns on the separate, but related, claims of two female police officers who were relieved of their duties after being found psychologically unfit to continue in their jobs. Because the facts of the case are unique to each plaintiff, we proceed with them in turn.

### A. Patricia Denhof

Patricia Denhof worked as a police officer for the Grand Rapids, Michigan, Police Department for 18 years prior to being relieved of her duties in 2002. Her removal from the police force, like that of her co-plaintiff LeClear, has its roots in a lawsuit filed in January 2001 in Michigan state court. In that lawsuit, nine female Grand Rapids police officers, including both plaintiffs here, claimed gender discrimination, retaliation and harassment in connection with their employment.

In November 2001, the state court held an eight-day hearing on the plaintiffs' motions to enjoin ongoing retaliation they claimed they were suffering as a consequence of filing the lawsuit. Denhof testified at the hearing, claiming that Grand Rapids police officers were behind an attempted break-in at her home, had followed her as she drove to work and had tapped her home telephone. She also claimed that her fellow officers had failed to provide back-up on several occasions when she requested it. After the attempted break-in at her home, Denhof communicated to her supervisor, Sergeant Potter, that she believed someone from the department was responsible and that she had taken out and loaded her personal handgun in case there was another break-in attempt. She also told Potter, "to spread the word, that I will kill anyone who comes into my house." J.A. at 1779-80. In her testimony in this case, Denhof clarified that she was referring to individuals who would come into her house illegally. At the conclusion of the hearing on December 3, the state court denied the plaintiffs' request for an injunction. The judge specifically cast doubt on the veracity of all of

---

[1] Rule 50(a) provides that a court may grant a motion for judgment as a matter of law "if during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue."

[2] Under Rule 59(a), "A new trial may be granted . . . in an action in which there has been a trial by jury for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States."

[3] A trial court may remit a jury award when, after viewing all evidence in the light most favorable to the award recipient, the court is convinced that the verdict is "clearly excessive, resulted from passion, bias or prejudice; or is so excessive . . . as to shock the judicial conscience of the court." *Gregory v. Shelby County*, 220 F.3d 433, 443 (6th Cir. 2000) (citing *Farber v. Massillon Bd. of Educ.*, 917 F.2d 1391, 1395 (6th Cir. 1990)).

Denhof's allegations and labeled her story of being followed a "gross exaggeration." J.A. at 2490-92.

Ten days after the hearing ended, Grand Rapids Police Chief Harry Dolan sent a letter to Dr. Glen Peterson, a police psychologist who performed evaluations for the department, asking whether, in light of the recent revelations, Dr. Peterson recommended that Denhof undergo a fitness for duty evaluation.[4] Dolan expressed concern that Denhof's testimony revealed emotional instability that "may cause her to endanger herself or others on the job." J.A. at 2161. The most pressing issue, according to Dolan, was the perceived threat that Denhof made to her fellow officers in the statement to Sergeant Potter.[5] In addition to the allegations revealed in her testimony, Dolan also included information about other incidents involving Denhof that he collected from members of his command staff following the injunction hearing.

On January 11, 2002, Dr. Peterson replied by letter, recommending that Denhof undergo a fitness for duty exam. He agreed with Dolan that Denhof's testimony raised concerns regarding her fitness to continue in her police duties. While presumably reserving judgment on Denhof's fitness until he examined her in person, Dr. Peterson observed:

> Clearly, the tension between Ofc. Denhof and the department has escalated to such a degree that it is difficult to imagine how she could continue to work in this environment. In that sense, whether the hostility is generated by her own actions or by mean-spirited fellow employees or command staff is almost irrelevant. It is something like a marriage gone bad. We can argue for years about whose fault it is, but at some point we are best off simply separating, for the good of all persons involved.

J.A. at 215. One week later, the department followed up on Dr. Peterson's recommendation and ordered Denhof to undergo a fitness for duty examination. In addition, the department confiscated Denhof's badge and police-issued firearm and placed her on paid administrative leave pending the outcome of the evaluation. Denhof followed these orders and met with Dr. Peterson for several sessions. During these appointments, Dr. Peterson administered a battery of psychological tests and evaluated Denhof interpersonally.

On April 2, 2002, Dr. Peterson reported to Chief Dolan that Officer Denhof was unfit for duty. J.A. at 235-57. He concluded that Denhof suffered from "some kind of emotional instability . . . that impairs her ability to efficiently perform her duties." Notably, he stopped short of any formal diagnosis of Denhof's mental condition. In her testimony in the present case, Denhof noted a series of factual errors in Dr. Peterson's report. *See* Denhof direct, R. 508, 43-54. Most notably, Dr. Peterson opined that Denhof's rough treatment of an armed robbery suspect supported his conclusion that she had difficulty maintaining her emotions. Denhof testified that she did not assault the suspect in question, pointing out that she received a commendation from the department for her role in the suspect's apprehension.

Police department and city officials provided Denhof with a copy of Dr. Peterson's report in an April 18 meeting. In this meeting, Denhof provided the city with two reports from her

---

[4] A fitness for duty evaluation is a psychological examination of an active police officer to determine whether the officer's mental state is impairing the officer's ability to perform police duties. Dr. Peterson testified that approximately 75% of the officers who undergo this type of evaluation are found unfit for duty. Peterson direct, R.515, 29.

[5] There is no indication that Potter shared Dolan's perception of Denhof's statement, since he did not report it up the chain of command at the time it was made.

personal doctors, one each from Dr. Lawrence Probes, a psychiatrist, and Dr. Mark Kane, a psychologist. The reports concluded that Denhof did not present any "evidence of diagnosable or treatable psychiatric disorder." *See* Denhof direct, R. 508, 29. The doctors further agreed that Denhof was fit to return to work. *Id.* at 29-32. George Childers, a labor relations officer for the city, told Denhof that he would forward the reports to Dr. Peterson, but there is no evidence in the record that Peterson ever received the reports. At this meeting, the city denied a request by Denhof and a union representative that the city obtain a second opinion. One week later, the city converted Denhof to unpaid leave.

After the city converted her to unpaid leave, Denhof called Childers and inquired about her employment status. Childers informed her that, because she had refused treatment, the city was going to terminate her on May 10. When Denhof protested that no one had recommended she undergo any type of psychological or psychiatric treatment, Childers relented and said he would look into the matter.

The city then arranged a follow-up appointment for Denhof to meet with Dr. Peterson on May 10 to discuss his suggested course of treatment. Denhof arrived at Dr. Peterson's office at the appointed time accompanied by her attorney. The precise sequence of events that followed is disputed, but it is apparent that a confrontation ensued and that Dr. Peterson eventually asked Denhof and her attorney to leave. Denhof testified that her attorney offered to remain in the waiting room while Denhof met with Dr. Peterson in his office, but Dr. Peterson declined. Dr. Peterson testified that he could not recall whether such an offer was extended, but admitted he might not have gone forward with the appointment under those conditions. *See* Peterson direct, R. 515, 64.

Dr. Peterson provided a set of treatment recommendations for Denhof in a May 22 letter to George Childers; Kurt Kimball, the city manager, forwarded the report to Denhof on May 31. J.A. at 2387-89, 2500. In this second report, Dr. Peterson suggested that Denhof suffered from a Personality Disorder and recommended that she receive counseling and medication to address it.[6] He recommended that Denhof continue to receive treatment from Drs. Probes and Kane, and suggested a course of treatment involving psychiatric medication. Interestingly, he noted that he had not seen any documentation from Denhof's treatment by Drs. Probes and Kane, even though George Childers had assured Denhof on April 18 that their reports would be forwarded to Dr. Peterson.

In his May 31 cover letter, City Manager Kimball informed Denhof that in reassessing her fitness for duty, the city would "only consider treatment options or medical professionals specifically identified in [Dr. Peterson's] letter or that are approved in advance by Dr. Peterson." J.A. at 2500. Kimball also instructed Denhof to contact George Childers by June 14 to let him know whether or not she intended to pursue the recommended treatment. If she refused treatment, the city would schedule a removal hearing.

Over the first two weeks of June, Denhof followed Kimball's directive by consulting with Dr. Kane and Dr. Probes. Denhof testified that she presented both doctors with Dr. Peterson's reports and asked them to treat her so she could return to work. In reports dated June 12, the two doctors took issue with Dr. Peterson's findings. Specifically, Dr. Kane advised that, in his opinion, Denhof did not suffer from a Personality Disorder and concluded that she was fit to return to work. Dr. Kane also offered to assist the city in transitioning Denhof back into the workplace. Dr. Probes, the psychiatrist, declined to issue Denhof any prescriptions because she did not fit the criteria for being treated with psychiatric medication.

---

[6] Dr. Peterson stopped short of any formal diagnosis in his first report, dated April 2, 2002. In the May 22 letter, Dr. Peterson supports his assertion that Denhof had a Personality Disorder by citing her allegedly confrontational behavior at their aborted May 10 appointment. J.A. at 2387.

Denhof provided both reports to George Childers on June 12.  After receiving no response, she attended a July 9 meeting of the Grand Rapids City Commission and distributed the reports to all of the commissioners.  Finally, on September 20, 2002, more than three months after Denhof replied to the city's treatment suggestions, Chief Dolan responded.  At the end of a letter primarily addressing unrelated matters, he wrote, "Based on your refusal to follow the treatment recommendations of Dr. Glen Peterson . . . and the continuing assertions that you are fit for duty at this time, our efforts to provide an avenue towards a return to duty have effectively been cut-off." J.A. at 2384-85.  On cross examination, Dolan testified that he concluded that Denhof was refusing treatment based on information provided to him by the department's internal affairs personnel.  He made no mention of having seen the reports by Drs. Probes and Kane.

Denhof's status with the city remained in limbo through the commencement of the district court trial in December 2004.  Because her pay was stopped, she was forced to take a series of part-time jobs as a baggage handler and house cleaner.  In 2004, she resumed police work as a part-time officer in Evart, Michigan, a 90-minute, one-way commute from her home in Grand Rapids.  In her time at the Evart Police Department, she has encountered no on-the-job difficulties and no questions have arisen regarding her fitness for duty as a police officer.

### B. Renee LeClear

Renee LeClear began work as Grand Rapids police officer in February 1995.  In 1998, she was one of five officers involved in an on-duty shooting, where the criminal suspect died from gunshot wounds inflicted by the officers.  After the shooting, LeClear and the other officers participated in a critical incident stress debriefing where they were provided with information about Posttraumatic Stress Disorder, a common affliction among officers involved in fatal shootings. Some time after this incident, LeClear confided in a fellow officer who had retired as a result of Posttraumatic Stress Disorder that she was experiencing ongoing stress related to the shooting. LeClear's colleague referred her to Dr. Lawrence Probes, a local psychiatrist.

Dr. Probes and his associate Dr. Mark Kane, a psychologist, treated LeClear for the shooting-related stress on three occasions in 2000 and 2001.  In October 2001, Dr. Probes drafted a report on LeClear's mental condition, where he concluded that she presented symptoms "consistent with Posttraumatic Stress Disorder."  J.A. at 2398-2405.  The symptoms identified by Dr. Probes included: panic attacks, depression, little trust for fellow officers, self-described hypervigilance, and a feeling that someone was spying on her.  To treat these symptoms, Dr. Probes recommended that LeClear undergo psychotherapy and mentioned that she might benefit from psychotropic medication at some point in the future.  Dr. Probes also noted that

> In spite of her residual symptoms of PTSD, I believe it is safe for Renée to work at this time.  In particular, I do not think her hypervigilance is of sufficient intensity to prevent her from carrying and using a firearm safely and appropriately in the line of duty.

J.A. at 2405.

In January 2001, nine months prior to Dr. Probes's report, LeClear was one of the nine female police officers that sued the city in state court claiming gender discrimination, harassment and retaliation.  In early December 2001, around the time of the injunction hearing, Chief Dolan acquired a copy of Dr. Probes's report, which had been turned over to the city as part of the state court discovery process.  On December 13, the same day he wrote a similar letter concerning Officer Denhof, Chief Dolan wrote to Dr. Glen Peterson expressing concern about the information in Dr. Probes's report and asking whether a fitness for duty evaluation was warranted.  J.A. at 2407-08. Chief Dolan cited the hypervigilance, emotional instability and feeling of being watched as

particular concerns, but did not raise any issues with LeClear's on-the-job performance. Notably, he also cited LeClear's avoidance of war movies and other depictions of violence as a concern; LeClear testified that she avoided violent movies and television shows on the recommendation of the mental health counselors retained by the city after the 1998 shooting incident.

On December 18, Dr. Peterson replied, recommending that LeClear undergo a fitness for duty exam. J.A. at 217-19. He wrote that he was confused about the nature of Dr. Probes's report and speculated that LeClear herself may have requested an examination of her fitness for duty. Such a request, according to Dr. Peterson, suggested that LeClear was unsure of her own fitness to serve. He also commented that Dr. Probes's report did not conform to established guidelines for fitness for duty evaluations. In view of Dr. Probes's comments regarding Posttraumatic Stress Disorder, Dr. Peterson also "strongly" recommended that LeClear be immediately referred to Dr. Mike Comer, a Posttraumatic Stress Disorder specialist. Chief Dolan apparently declined to follow this portion of Dr. Peterson's recommendation, but decided to proceed with the fitness examination.

On January 18, 2002, a full month after Dr. Peterson's letter, the police department relieved LeClear of her duties and confiscated her badge and firearm; they also ordered LeClear to see Dr. Peterson for a fitness for duty evaluation. The city placed LeClear on paid administrative leave pending the outcome of the evaluation.

After several consultations with LeClear, Dr. Peterson wrote Chief Dolan on March 14 to advise Dolan that he found LeClear unfit for duty. J.A. at 2414-26. Dr. Peterson concluded that while he did not believe LeClear suffered from Posttraumatic Stress Disorder, "it was difficult for me (Peterson) to imagine how she could ever return to work at the department." J.A. at 2425. Dr. Peterson stated that, in his opinion, LeClear's symptoms were more accurately characterized as a Personality Disorder. Treating Personality Disorders is quite difficult, according to Dr. Peterson, as medications and individual psychotherapy are usually ineffective. Pursuant to Dr. Peterson's recommendation, LeClear was switched to unpaid leave in early April.

On April 22, LeClear received a letter from Margaret McCrystal, a labor relations official for the city, advising her that if she did not elect to use her accrued sick leave, she would be involuntarily separated from employment on May 1, 2002. J.A. at 2430. McCrystal noted that LeClear had advised the city that she was under the care of her own doctors and invited LeClear to submit reports from them for consideration by the city physician. LeClear testified that she submitted reports from Drs. Probes and Kane, who both found her fit for duty, around this time.

On May 1, McCrystal wrote to LeClear again, informing her that City Manager Kimball had taken the matter of LeClear's involuntary separation under advisement, and as a result, LeClear would not be separated at that time. J.A. at 2432. On May 3, Kimball wrote LeClear that since she had not been provided any treatment options, he had arranged for her to meet with Dr. Peterson on May 10 to discuss his recommendations. J.A. at 2434. He noted that he and Chief Dolan hoped that LeClear would avail herself of Peterson's suggested treatment and that, after successful treatment, the city would consider reinstating her.

LeClear's May 10 appointment was later in the day than plaintiff Denhof's appointment, and LeClear similarly showed up for the meeting accompanied by her attorney. Apparently weary from the earlier confrontation, Dr. Peterson cracked the door to his office just wide enough to tell LeClear that he did not have any treatment recommendations for her and that her appointment had been cancelled. Three weeks later, LeClear received Dr. Peterson's treatment suggestions in writing. J.A. at 2438-39, 2441. In his report, Dr. Peterson reiterated his diagnosis of a Personality Disorder, and indicated that, contrary to his comment in the previous report, he had recently read an article indicating that individual psychotherapy was the treatment of choice for persons with Personality Disorder. Consequently, Dr. Peterson recommended LeClear participate in group and individual

therapy sessions. He also commented that "it [is] important for her to stay connected with Dr. Probes and Dr. Kane" and recommended several additional therapists if LeClear decided to make a switch. In the cover letter accompanying Dr. Peterson's report, Kimball instructed LeClear to inform the city by June 14 as to whether she had accepted the treatment recommendations.

LeClear proceeded in the same fashion as Denhof, consulting with her personal psychologist, Dr. Kane. After these consultations, Dr. Kane reported to the city on June 12 that "Officer LeClear currently is very stable and not dealing with any clinically diagnosable mental health disorders." J.A. at 2443-47. In reaching this conclusion, he specifically disputed Dr. Peterson's diagnosis of a Personality Disorder. He noted that the stresses in LeClear's life were primarily associated with her ongoing litigation with the city, and that absent this stressor, she would not require any psychological counseling. In light of these findings, Dr. Kane states that LeClear was fit to return to work at the police department and offered his assistance in easing her back into the police force. The city never responded to Dr. Kane's report.

Like Officer Denhof, the city refused to provide references when LeClear subsequently sought outside employment. At the time of trial, she had recently resumed police work, as a part-time officer in Evart, Michigan. There is no evidence of any performance problems in her new role, nor any record of questions regarding her fitness to serve.

## II. Analysis

This matter was tried before a jury in the Western District of Michigan beginning November 29, 2004. After a two-week trial, the jury returned a verdict for the plaintiffs, awarding each of them $1 million in compensatory damages, plus back pay and front pay. In early May 2005, the court granted 1) the city's post-verdict motion for judgment as a matter of law, and alternatively its motions for 2) a new trial on the grounds that the verdict was against the weight of the evidence and 3) remittitur. J.A. at 136-56.

We will begin by reviewing the substantive law of Title VII employment retaliation claims. Then, we will move to the standards for judgments as a matter of law and motions for a new trial and the accompanying standards of review employed by appellate courts. Finally, we will address the remittitur decision as well as the defendant's cross-appeals.

### A. Employment Retaliation Framework

Employment retaliation claims may be proven by direct evidence of a retaliatory motive[7] or through the *McDonnell-Douglas* burden shifting framework. *Abbott v. Crown Motor Co.*, 348 F.3d 537, 542 (6th Cir. 2003). To establish a case under the burden shifting method, a plaintiff must show: 1) she engaged in a protected activity, 2) the employer was aware of the protected activity, 3) she suffered an adverse employment action and 4) there is a causal connection between the protected activity and the adverse employment action. *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 563 (6th Cir. 2004).

If the plaintiff establishes this prima facie case, the burden shifts to the defendant to provide a legitimate, non-discriminatory reason for the challenged action. *Id.* If the defendant satisfies this burden, the plaintiff must show by a preponderance of the evidence that the defendant's stated reason 1) has no basis in fact, 2) did not actually motivate the adverse action or 3) was insufficient to motivate the adverse action. *Id*. at 564. Where the employer took the adverse employment action in the honest belief of information provided by a third party, the plaintiff cannot win by showing that

---

[7] The district court held that plaintiffs had failed to present any direct evidence of retaliatory motive and the plaintiffs do not challenge that finding on appeal.

the information was mistaken or incorrect.  *Smith v. Chrysler Corp.*, 155 F.3d 799, 806 (6th Cir. 1998) (citing *Kariotis v. Navistar Int'l Trans. Corp.*, 131 F.3d 672, 676 (7th Cir. 1997)).  To prevail, the plaintiff must show that the employer's reliance on the outside opinion was unreasonable.  *Id*.  In its opinion, the district court casts doubt on the plaintiffs' proof of a causal connection,[8] but rests its holding on the plaintiffs' inability to show pretext in light of the *Smith* "honest belief" rule.

### B. Judgment as a Matter of Law/New Trial Motion

A district court should grant a judgment as a matter of law where "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed. R. Civ. P. 50(a).  In conducting such an analysis, the evidence must be construed in the light most favorable to the non-moving party.  *Ratliff v. Wellington Exempted Vill. Sch. Bd. of Educ.*, 820 F.2d 792, 795 (6th Cir. 1987).  We review a grant of judgment as a matter of law de novo.

A motion for a new trial may be granted if a court determines that the verdict is clearly against the weight of the evidence.  *J. C. Wyckoff & Assoc. v. Standard Fire Ins. Co.*, 936 F.2d 1474, 1487 (6th Cir. 1991).  The district court's grant of a motion for a new trial is reviewed for an abuse of discretion.  Since granting a judgment as a matter of law is governed by a higher showing and overturning such a grant by a more rigorous standard of review, and in this case we are reversing both the judgment as a matter of law and the grant of a new trial, our discussion will focus on the motion for new trial.  By extension, this analysis applies to reverse the judgment as a matter of law as well.

In considering a motion for a new trial on the ground that the verdict is against the weight of the evidence, the court is not to set aside the verdict simply because it believes that another outcome is more justified.  *TCP Indus., Inc. v. Uniroyal, Inc.*, 661 F.2d 542, 546 (6th Cir. 1981).  The court is to accept the jury's verdict "if it is one which reasonably could have been reached." *Duncan v. Duncan*, 377 F.2d 49, 52 (6th Cir. 1967).  Trial courts have relatively wide latitude to grant new trial motions under the abuse of discretion standard, but this court has held:

> Where no undesirable or pernicious element has occurred or been introduced into the trial and the trial judge nonetheless grants a new trial on the ground that the verdict was against the weight of the evidence, the trial judge in negating the jury's verdict has, to some extent at least, substituted his judgment of the facts and the credibility of the witnesses for that of the jury.  Such an action effects a denigration of the jury system and to the extent that new trials are granted the judge takes over, if he does not usurp, the prime function of the jury as the trier of the facts.  It then becomes the duty of the appellate tribunal to exercise a closer degree of scrutiny and supervision than is the case where a new trial is granted because of some undesirable or pernicious influence obtruding into the trial.  Such a close scrutiny is required in order to protect the litigants' right to jury trial.

*Id.* at 54 (quoting *Lind v. Schenley Indus., Inc.*, 278 F.2d 79, 90 (3d Cir. 1960) (en banc)).  To put it more succinctly, this court will overturn a grant of a motion for a new trial on the basis that the verdict was against the weight of the evidence where it is clear that the jury verdict was reasonable.

This court cited the heightened standard of review from *Duncan* in overturning a grant of a new trial where "the case came down to a question of who the jury believed." *Holmes v. City of Massillon,* 78 F.3d 1041, 1048 (6th Cir. 1996).  In *Holmes,* the plaintiff sued the city for injuries she sustained when a police officer exercised excessive force in booking her into the city jail.  *Id.* at

---

[8] The city did not contest the plaintiffs' proof on the first three prima facie elements.

1043. Because of a lack of physical evidence, such as bruising or other physical injuries, the outcome at trial turned on whose account of the booking the jury believed, the plaintiff or the police officer. The district court granted a motion for a new trial following a jury verdict for the plaintiff and this court reversed, finding that it was not unreasonable for the jury to believe the plaintiff's testimony and conclude that the officer used excessive force. *Id.* at 1048.

In this case, the district court held that the evidence could only support a finding that Chief Dolan (and by extension the city government) reasonably relied on Dr. Peterson's opinion that the plaintiffs were unfit for duty and could not support a finding that Dolan's reliance on Peterson was unreasonable.[9] We disagree and hold that a reasonable juror could have concluded that Dolan's reliance on Dr. Peterson's opinion was unreasonable in light of Dr. Peterson's actions and the broader actions by city officials. The jury was explicitly instructed on the *Smith* "honest belief" standard and there is no reason to suspect that they ignored it or misconstrued it while deliberating. In our view, the plaintiffs presented significant evidence that the city's actions were taken in retaliation for filing the state lawsuit.

In his January 11, 2002, letter recommending a fitness for duty examination for Patricia Denhof, Dr. Peterson employed language that, at a minimum, suggested his opinion had already been formed. For instance, he noted that in view of the tension between Denhof and the department, "it is difficult to imagine how she could continue to work in this environment." J.A. at 2394. Further, he indicated that it did not matter where the fault lay, opining that the relationship required a divorce like "a marriage gone bad." *Id.* This language should have signaled to Chief Dolan, and indeed any reasonable recipient, that Dr. Peterson was predisposed to finding Denhof unfit for duty. Indeed, after comments like this, it is hard to see any possibility that Dr. Peterson's examination would yield a result other than finding that Denhof should be separated from the police force. Instead, when Dolan was confronted with a psychologist who had already formed his opinion before examining the patient, he asked that doctor to proceed with the examination. In doing so, he forfeited the protection of the honest belief rule, because the jury could have easily concluded that his reliance on a doctor who had already made up his mind did not qualify as reasonable reliance.

Chief Dolan's decision to wait to suspend the plaintiffs until two months after the injunction hearing raises concern about the sincerity of his belief that the plaintiffs posed a danger to themselves or others. As the district court notes in its opinion, J.A. at 148, the time lag alone was ambiguous. Indeed, if Dolan had acted immediately after the plaintiffs' testimony, they might argue that the swift action was evidence of a retaliatory motive.

Here, however, the lag combined with the testimony of Chief Dolan and Officer Scott Hillyer provided the jury a basis for concluding that the lag was evidence of the city's retaliatory motive. Chief Dolan testified that, in early December, he believed Denhof was a danger to herself and others, but for six more weeks, he allowed this "dangerous" officer to patrol the streets of Grand Rapids. When pressed for an explanation of why he waited until January 18 to place Denhof on paid leave,

---

[9] The district court also expressed some doubt whether the plaintiffs satisfied the causal connection prong of the prima facie test, but we believe that the plaintiffs met this burden. On several occasions, this court has held that the temporal proximity between a plaintiff's protected activity and the adverse employment action can satisfy the causal connection requirement. *See DiCarlo v. Potter*, 358 F.3d 408 (6th Cir. 2004) (holding a 21-day period between the plaintiff's Equal Employment Opportunity complaint and his termination sufficient to establish a causal connection); *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555 (6th Cir. 2004) (holding a period of three months between the plaintiff's discrimination charge and his termination sufficient to establish a causal connection).

Here, the lapse in time between the plaintiffs' testimony at the injunction hearing and the commencement of the retaliatory conduct fits easily within the time-frames that have sufficed to establish causal connection in earlier cases. Further, contemporaneous evidence, including the implication in Dr. Peterson's January 11 letter regarding Denhof that he had already made up his mind regarding her fitness to serve (e.g., "[I]t is difficult to imagine how she could continue working in this environment."), corroborate the inference raised by the timing of the city's actions.

Dolan responded, "I believe that the course of action I took was deliberate and appropriate for all the information and the situation I was dealing with, and that's my response, sir."[10] *See* Dolan cross, R.513, 22-23. Dolan's lack of an explanation is even more suspect when viewed in conjunction with Officer Scott Hillyer's assertion that prior department practice had been to suspend officers immediately when concern arose that they might be a danger to themselves or others. *See* Hillyer direct, R.506, 69-70. The jury could have easily concluded on the basis of the time lag and the chief's departure from past department practice that something other than concern about the plaintiffs' fitness, namely retaliation, was motivating Dolan's actions.

Dolan's motives were also called into question by his lack of response to Dr. Peterson's recommendation that he immediately refer LeClear for therapy for Posttraumatic Stress Disorder. In his December 18, 2001, letter recommending that LeClear be referred for a fitness for duty examination, Dr. Peterson "strongly" recommended that LeClear be immediately referred to Dr. Mike Comer in Kalamazoo, Michigan, a specialist in treating Posttraumatic Stress Disorder. J.A. at 219. LeClear testified (LeClear direct, R.509, 14) and Dolan confirmed (Dolan cross, R.514, 71-72) that he did not follow this aspect of Dr. Peterson's advice. Dolan's failure to do so undermined two aspects of his testimony. First, he testified repeatedly that his primary concern in this episode was his officers' well-being and that he wanted to enable them to receive treatment so they could return to work. Second, he testified that his decisions throughout this process were driven by his reliance on Dr. Peterson's recommendations. Given his inaction in referring LeClear for immediate treatment, the jury could have reasonably concluded that Dolan's actions were inconsistent with his professed motivations.

Dr. Peterson's behavior at the plaintiffs' appointments to discuss treatment options provided the jury one more reason to conclude that relying on his advice was somewhat less than reasonable. The exact sequence of events on May 10, 2002, is disputed, but if the jury believed the plaintiffs, Dr. Peterson refused to see them even if their attorney remained in the waiting room during the consultation. LeClear also testified that Dr. Peterson told her that he did not have any treatment recommendations for her, when that was the express purpose of the visit. Given this refusal to meet with the plaintiffs, the jury could have reasonably concluded that this incident indicated that the city's reliance on Dr. Peterson's advice was unreasonable.

In addition to the evidence regarding Chief Dolan and Dr. Peterson, two incidents involving other city officials also provided the jury with evidence that retaliatory motives, rather than reasonable reliance on Dr. Peterson, was driving the city's decision-making. First, in late April 2002, both plaintiffs were informed that they were going to be terminated. This occurred after they had been found unfit for duty, but before anyone had provided them with treatment recommendations. In fact, city official George Childers told Denhof that she was going to be fired because she had refused treatment. In both cases, the city later back-tracked in order to provide the plaintiffs with treatment options. The fact that two separate city officials threatened the plaintiffs with termination (LeClear was notified by a letter from Margaret McCrystal) shows that the city was proceeding without all the facts, and certainly provided the jury a basis to conclude that the city's goal in this entire process was to terminate the plaintiffs in retaliation for their lawsuit.

The second and more troubling action, or more specifically inaction, by the city was its failure to respond to the plaintiffs after they submitted reports from their personal doctors on June 14, 2002. On May 22, the city provided the plaintiffs with Dr. Peterson's treatment recommendations and ordered them to advise the city of their intentions to follow or disregard these recommendations by June 14. Denhof and LeClear followed Dr. Peterson's advice that they seek

---

[10] Dolan waited a similar amount time before suspending LeClear and, as was the case for Denhof, he could provide no explanation for why he elected to wait.

treatment from their personal psychologist, Dr. Mark Kane, and psychiatrist, Dr. Lawrence Probes. During this period, the plaintiffs each consulted with Drs. Kane and Probes and provided the doctors copies of Dr. Peterson's reports.

In Denhof's case, Dr. Kane reported to the city that, contrary to Dr. Peterson's diagnosis, Denhof did not suffer from a Personality Disorder that rendered her unfit for duty. Dr. Probes refused to prescribe psychiatric medication for Denhof as Dr. Peterson, a psychologist, had recommended because she did not fit the criteria for being treated with such medication.

Dr. Kane also reported that LeClear was "very stable and not dealing with any clinically diagnosable mental health disorders." He specifically refuted Dr. Peterson's diagnosis of a Personality Disorder and advised the city that there was no "clinical or diagnostic" reason to keep LeClear off duty.

Denhof and LeClear submitted the reports of Drs. Kane and Probes concerning each of them to the city on June 14, 2002. The reports told the city that there was nothing wrong with the plaintiffs, just as the doctors had previously advised the plaintiffs. At this point, the city had asked the plaintiffs to advise it of whether they were going to pursue the recommended mental health treatment and the plaintiffs' doctors, who they had been referred to by the city's psychologist, had told them there was nothing wrong with them. Upon receiving this information, the city did nothing. There is no evidence they even forwarded the reports from Drs. Probes and Kane to Dr. Peterson for his review. They did nothing, while plaintiffs remained suspended from work without pay. The city did not pursue an independent opinion from a third doctor, arrange for a meeting between Dr. Peterson and Drs. Kane and Probes, or even acknowledge receipt of the new reports and advise the plaintiffs that the city was standing behind Dr. Peterson. Instead, city officials, including Chief Dolan, continued operating under the belief that the plaintiffs were refusing treatment. *See* Dolan cross, R. 513, 234-40.

The city ordered the plaintiffs to receive treatment from their own doctors, and when those doctors reported that there was nothing wrong with them, the city did nothing for the next two and a half years while the plaintiffs remained suspended without pay. This lack of response provided a more than sufficient basis for the jury to conclude that the city was not acting out of concern for its employees, but instead was doing whatever it needed to do to prevent the plaintiffs from returning to work.

In light of all of this evidence, we hold that a reasonable jury could have concluded that the city did not reasonably rely on Dr. Peterson's recommendation regarding the plaintiffs and was instead retaliating against the plaintiffs for their claim of discrimination against the city. We therefore find that the district court erred in entering judgment as a matter of law and abused its discretion in granting a new trial.

### C. Remittitur

We agree with the district court that $1 million in compensatory damages, exclusive of front and back pay was excessive, and should be remitted to $350,000. As the district court noted, the plaintiffs have the option of accepting this reduced compensatory award or electing a new trial. *Brewer v. Uniroyal, Inc.*, 498 F.2d 973, 977 (6th Cir. 1974).

A jury verdict should not be remitted "unless it is beyond the maximum damages that the jury reasonably could find to be compensatory for a party's loss." *Farber v. Massillon Bd. of Educ.*, 917 F.2d 1391, 1395 (6th Cir. 1990) (quoting *Green v. Francis*, 705 F.2d 846, 850 (6th Cir. 1983)). A court should not reduce an award unless it is: 1) beyond the range supported by proof;  2) so excessive as to shock the conscience; or 3) the result of mistake. *Bickel v. Korean Air Lines Co., Ltd.*, 96 F.3d 151, 156 (6th Cir. 1996). We review the grant of remittitur for abuse of discretion.

As the district court pointed out, the $1 million damage awards exceeded the amount justified by the plaintiffs' evidence. There is no question that the city's actions caused the plaintiffs humiliation and mental anguish, but the plaintiffs did not present any evidence of serious or long-lasting mental injuries. Furthermore, the $1 million awards far exceeded the demands of the plaintiffs' own lawyers. In closing arguments, counsel for both Denhof and LeClear asked the jury to award their clients back pay, front pay and $500,000 in compensatory damages. *See* Denhof closing argument, R. 516, 49; LeClear closing argument, R.516, 72. Presumably, the plaintiffs' attorneys requested the amount of damages they believed were supported by the evidence. That being so, it is difficult to see how remitting an award of two times the amount suggested by plaintiffs' own counsel could constitute an abuse of discretion. We therefore affirm the district court's decision to remit the plaintiffs' compensatory awards to $350,000 each.

## D. Defendant's Cross-Appeals

The city raises six issues on cross-appeal including the summary judgment decision, several evidentiary matters and the district court's denial of remittitur for front pay and back pay. We affirm the district court's decision on each of these issues.

First, the city argues that the district court erred in denying its motion for summary judgment.[11] Specifically, the city contends that the court was incorrect in finding that Chief Dolan's letters to Dr. Peterson were direct evidence of retaliation. If the court had applied the *McDonnell-Douglas* burden shifting framework, the city concludes, it would have found that the plaintiffs could not establish causal connection or pretext. We agree with the city that Chief Dolan's letters to Dr. Peterson did not rise to the level of direct evidence of retaliatory motive, but the plaintiffs did present sufficient evidence to satisfy the prima facie case (including casual connection), allowing them to present a triable question to the jury regarding pretext.

Second, the city argues that the district court erred in denying its motion for a directed verdict at the close of the evidence. As outlined above, however, we hold that the plaintiffs satisfied their prima facie burden and presented sufficient evidence suggesting pretext to raise a triable issue of fact.

Third, the city argues that the district court erred in ten different evidentiary decisions, admitting or refusing to admit evidence based on incorrect applications of Federal Rules of Evidence 401 and 403. For instance, the city contends that the district court erred in not allowing it to introduce evidence of Denhof's on-the-job deficiencies. The city also argues that the court erred in allowing plaintiffs to introduce evidence that the city prevented Denhof from transferring her accumulated paid leave to LeClear and that the city contested LeClear's request for unemployment compensation. We do not agree that these decisions by the district court were in error. Further, to the extent that the plaintiffs mentioned evidence that had been excluded before trial, the admission constituted harmless error. *See* Fed. R. Civ. P. 61 ("No error in the admission or exclusion of evidence . . . is ground for granting a new trial or for setting aside a verdict . . . unless refusal to take such action appears to the court inconsistent with substantial justice.").

Fourth, the city argues that the compensatory damage award of $1 million, which was subsequently remitted to $350,000, should have been capped at $300,000 pursuant to 42 U.S.C. § 1981a(b)(3)(D). In their complaints, the plaintiffs claimed retaliation in violation of both Title VII and the Michigan Elliott-Larsen Civil Rights Act against the city. Because the jury's verdict was based on both federal and state law claims, the plaintiffs were entitled to elect which statute they would receive damages under. Since the Michigan statute has no damage caps, the Title VII limits

---

[11] To clarify, Judge Miles denied the city's motion for summary judgment, but Judge Quist conducted the trial and ruled on post-trial motions.

do not apply. The city's reliance on *Hudson v. Reno*, 130 F.3d 1193, 1199-1202 (6th Cir. 1997), is misplaced. In *Hudson*, we held that the cumulative recovery for different Title VII claims (e.g., discrimination and retaliation) was subject to the cap. The case does not apply to limit recovery of compensatory damages for violations of state law.

Finally, the city argues that the district court erred when it refused to reduce the jury awards for front pay or back pay. We interpret this claim as appealing the lower court's denial of the defendant's motion to remit the plaintiffs' front pay and back pay awards. J.A. at 153. We review the district court's denial of remittitur for abuse of discretion.

In fashioning the front pay award, the district court ordered that the jury award of $1,276,920 for each plaintiff be paid over time as the plaintiffs would have earned their salaries. This award is to be offset by any earnings the plaintiffs receive if reinstated by the city or if they find comparable employment. If either of the plaintiffs dies or becomes incapacitated before the payout of the entire award, the city is not liable for the balance owed. This approach carefully balances the preferred equitable remedy of reinstatement, *Gutzwiller v. Fenik*, 860 F.2d 1317, 1333 (6th Cir. 1988), with the prospect that the plaintiffs might face future incidents of retaliation if reinstated. The decision to allow the city to decide whether to reinstate the plaintiffs or pay them the salary they would have earned is an appropriately crafted equitable remedy. The city contends that the awards amount to lifetime pay and are unduly speculative, but these arguments are unavailing. We hold that the court's denial of remittitur for the front pay award was not an abuse of discretion.

The city's argument that the award of back pay was excessive is based on two observations. First, the city notes that the jury's award of $223,080 exceeds the $194,480 that each of the plaintiffs requested from the jury. Secondly, the city argues that the plaintiffs' figures were not supported by evidence and should have been considerably lower. Although the difference between the jury award and the amounts requested by the plaintiffs is curious, we cannot agree that it amounts to an abuse of discretion. As Denhof argues, both plaintiffs testified that they regularly earned overtime pay, and the jury's award could simply reflect an allowance for overtime pay. Also, to the extent that the figures requested by the plaintiffs overstated the value of their lost benefits, the district court corrected the error by increasing the back pay setoff amount to reflect the health insurance benefits each plaintiff received after her pay was stopped.

For the foregoing reasons, we affirm the decision of the district court, in part, and reverse, in part.

———————————

**DISSENT**

———————————

ALICE M. BATCHELDER, Circuit Judge.  I respectfully dissent from the majority's conclusion that the district court erred in granting the judgment as a matter of law.  Based on the entire record, part of which the majority relates in great detail, I would find - as the district court found - that the plaintiffs failed to prove causation or pretext.

Because the Grand Rapids Police Department was a defendant in the state court gender discrimination and sexual harassment action brought by certain Grand Rapids police officers, Police Chief Dolan was present for the hearing in that court on the plaintiffs' motion for a preliminary injunction, and he personally observed Ms. Denhof's testimony in that case.  As a result of what he heard and saw, as well as the trial court judge's conclusions that Ms. Denhof's claims were simply not true, Chief Dolan was concerned that Ms. Denhof might not be fit for duty.  He met with his command staff immediately after the court denied the injunction on December 3, 2001, and asked them to put together the documents and statements from officers on the force detailing Ms. Denhof's behavior during recent months.  The record shows that Chief Dolan's staff responded on December 5, 2001, and December 7, 2001.  On December 13, Chief Dolan sent a letter to Dr. Peterson, detailing his concerns and forwarding the documentation of Ms. Denhof's recent behavior.

Dr. Peterson's response included some very specific and worrisome concerns.  Specifically, Dr. Peterson said:

> Based on my reading of the incident on the firing range, it appears that she is extremely hostile, and may no longer be capable of following a simple command. I know Officer Whalen [the firing range instructor] to be a reasonable, calm and gentle person, totally committed to following policies and procedures . . . .  His report on her behavior is not only credible, but alarming.  Also alarming are the comments she has made in court while under oath.  These are claims that will have to be evaluated by the judicial system.  Apart from that, whether she can work in an environment where *she believes* her accusations are true is another serious issue, and should be evaluated clinically . . . .  It appears to me that the question of her fitness for duty has been raised not only with her court testimony, but by her behavior on the range, and therefore that question needs to be addressed.  I have no doubt that there are adequate reasons to refer her for a fitness-for-duty evaluation.

The referenced "incident on the firing range" had occurred only a few months earlier, on October 5, 2001, and had involved a series of overtly hostile and insubordinate responses by Ms. Denhof to the commands of the firing range instructor.

Chief Dolan's letter to Dr. Peterson about Ms. LeClear, which was prompted principally by the report of Dr. Probes, included Ms. LeClear's own responses on a questionnaire that is part of Dr. Probes's report: "Someone is spying on me.  Someone is persecuting me.  Someone or a group is plotting to harm me.  Someone has placed hidden microphones or cameras to spy on me.  (This is true!)  My telephone is taped or bugged.  (Don't know.)"

Dolan sent to Dr. Peterson not only the information from the plaintiffs' files that caused him to seek expert advice on whether the plaintiffs should be evaluated as to their fitness for duty, but the favorable information from their files as well.  The City eventually had both plaintiffs examined

by another psychologist, Dr. Anthony Stone, who concluded that both of them were unfit for duty. Under these circumstances, I find that the plaintiffs failed to prove causation or pretext.

I do not find the relatively brief span of time between the plaintiffs' testimony at the injunction hearing and Chief Dolan's suspension of them to be sufficient to establish a causal connection between the two events. Similarly, I do not find Chief Dolan's failure to suspend the plaintiffs sooner to demonstrate insincerity of his professed belief that the plaintiffs were not fit for duty. In my view, these two conclusions are wholly inconsistent. Although this circuit has held that temporal proximity may be evidence of a causal connection between an employee's protected conduct and the employer's allegedly retaliatory action, we have never held that temporal proximity alone is sufficient to *prove* causation. *See*, *e.g.*, *Nguyen v. Cleveland*, 229 F.3d 559, 566 (6th Cir. 2000) ("[T]emporal proximity alone will not support an inference of retaliatory discrimination when there is no other compelling evidence."); *Hatchett v. Health Care & Ret. Corp. of Am.*, 186 F. App'x 543, 551 (6th Cir. 2006) ("a plaintiff must provide some evidence beyond temporal proximity to demonstrate a retaliatory causal connection"). In *DiCarlo v. Potter*, 538 F.3d 408, 422 (6th Cir. 2004), we held that temporal proximity may "constitute indirect evidence of causal connection so as to create an inference of retaliatory motive" for purposes of establishing a prima facie case, but we did not hold, and have never held - as the majority opinion does here - that temporal proximity is "sufficient to establish a causal connection." In the present case, the only evidence of causation or pretext is temporal proximity, and that is insufficient.

Based on my reading of the record in this case, I would affirm district court's order granting the defendants' Rule 50(b) motion for the reasons given by the district court in that order.