NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0588n.06

Case No. 19-3243

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

**FILED**
Oct 16, 2020
DEBORAH S. HUNT, Clerk

|  |  |
|---|---|
| ELIZABETH GOODWIN, As Administrator of the Estate of Brian Garber, | ) ) ) |
| Plaintiff-Appellant, | ) ) |
| v. | ) ) ) |
| RICHLAND COUNTY, OHIO, et al., | ) ) |
| Defendants, | ) ) |
| RAYMOND FRAZIER, | ) ) |
| Defendant-Appellee. | ) |

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO

BEFORE: BOGGS, DONALD, and THAPAR, Circuit Judges.

THAPAR, Circuit Judge. Juries are in the business of deciding material issues of fact. This case was no exception: A jury determined that the defendant police officer acted reasonably in a tense and dangerous situation. Now, the plaintiff wants another shot to convince another jury otherwise. Finding no error with the trial, we affirm.

I.

Brian Garber and his wife, Sara Knowlton, lived with their two children across the street and down the hill from Garber's parents. One evening, Garber returned home from work to find his wife had locked him out of the house. He kicked open the back door, entered the house, and

pushed Knowlton down. When Garber's mother intervened, he pushed her too. The women then called 911 for help, and Garber left the house.

When the police arrived, Garber was nowhere to be found. Both Garber's mother and Knowlton were worried about Garber's mental state and told the police about his history of mental illness.

Later that evening, Knowlton called the police again. This time she informed them that Garber had sent her text messages stating that he had a gun and was going to kill her. So, the police returned.

At about the same time, Garber's parents discovered Garber in his childhood bedroom. They tried to speak with him. During their encounter, Garber hid one hand under his shirt and suggested that he was holding a gun. His mother left for Knowlton's home and arrived to find officers responding to Knowlton's second 911 call.

The officers now believed that Garber was armed, and they headed to the parents' home. Sergeant James Nicholson, Deputy Andrew Knee, and Deputy Raymond Frazier entered the Garber home, and Garber's father directed them upstairs to Garber's bedroom.

When the officers approached Garber's bedroom, they found Garber sitting on his bed with his back against the headboard. He reported that he had a gun. Nicholson and Knee positioned themselves along both sides of the doorframe—a strategic position that provided them some cover. Frazier then entered the room.

The officers saw Garber's left hand down by his side and his right hand hidden beneath his shirt. A "distinct rectangular shape" protruded. R. 166, Pg. ID 2577. Frazier and Nicholson saw the object moving back and forth under Garber's shirt, pointing at one police officer and then the other. But Officer Knee stated that the object was stationary.

At this point, both Nicholson and Frazier told Garber to drop his weapon and show his hands; Garber refused. Nicholson tried to de-escalate the situation—even offering to get Garber help. Still, Garber refused to show his hands or drop his "weapon."

Frazier, whose gun had been out from the moment that Garber announced he was armed, now pointed it directly at Garber. Both Nicholson and Knee had their guns drawn. Garber had not threatened to shoot the officers, and none had yet resorted to using his weapon. That changed when they heard a loud "pop"—like a gunshot—that emanated from inside the bedroom. The officers disagree about whether Garber moved when the pop sounded. All three, though, had the same reaction: They fired at Garber, killing him.

The horrible reality was that Garber was unarmed. It is unclear whether the "gun" under his shirt was a remote control or just his hand. The source of the pop, too, remains a mystery.

The administrator of Garber's estate (the plaintiff) sued multiple officers as well as various government entities, alleging that the use of deadly force violated the Fourth Amendment. *See* 42 U.S.C. § 1983. Only the claims against Knee, Nicholson, and Frazier survived summary judgment. The officers appealed the district court's denial of qualified immunity, but we affirmed. *Knowlton v. Richland Cnty.*, 726 F. App'x 324, 332 (6th Cir. 2018).

On remand, the plaintiff dismissed the claims against Knee and Nicholson, but proceeded to trial against Frazier on the excessive-force claim. *See* 42 U.S.C. § 1983. The district court prohibited both sides from presenting their proffered expert testimony. The jury found for Frazier.

The plaintiff then asked the court to alter or amend the judgment or to grant her a new trial. She offered two reasons: (1) The verdict was unreasonable and against the manifest weight of the evidence, and (2) the district court improperly excluded her expert evidence.[*] Fed. R. Civ. P.

---

[*] The plaintiff additionally urged that the judgment constituted "manifest injustice." *See GenCorp, Inc. v. Am. Int'l Underwriters*, 178 F.3d 804, 834 (6th Cir. 1999) (noting that a motion to alter or amend the judgment may be granted

59(a), (e). The district court disagreed, finding that the jury's verdict was reasonable given the evidence presented, and that the court had not erred in excluding both parties' experts. The plaintiff now appeals, asking for a new trial.

## II.

On appeal, the plaintiff argues what she did below: (1) The verdict was against the manifest weight of the evidence, and (2) the exclusion of her expert testimony about police practices rendered the trial unfair. We review both the denial of her post-trial motion and the exclusion of expert testimony for an abuse of discretion. *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528 (6th Cir. 2008) (exclusion of evidence); *GenCorp, Inc. v. Am. Int'l Underwriters*, 178 F.3d 804, 832 (6th Cir. 1999) (alteration or amendment of the judgment); *Holmes v. City of Massillon*, 78 F.3d 1041, 1045 (6th Cir. 1996) (new trial).

## A.

First, the plaintiff argues that the jury's verdict was against the manifest weight of the evidence. Generally, we "uphold the verdict if it was one which the jury reasonably could have reached; we cannot set it aside simply because we think another result is more justified." *Armisted v. State Farm Mut. Auto. Ins. Co.*, 675 F.3d 989, 995 (6th Cir. 2012) (citing *Denhof v. City of Grand Rapids*, 494 F.3d 534, 543 (6th Cir. 2007)). We only reverse if we reach a "definite and firm conviction that the trial court committed a clear error of judgment." *Id.* (quoting *Mich. First Credit Union v. Cumis Ins. Soc'y, Inc.*, 641 F.3d 240, 245–46 (6th Cir. 2011)).

To prove that Frazier violated Garber's right to be free from an unreasonable seizure, she had to show that the use of deadly force was objectively unreasonable under the totality of the

---

"to prevent manifest injustice"). But both in the district court and on appeal she has characterized this as substantially the same as her argument that the verdict was against the manifest weight of the evidence, so we need not address it separately.

circumstances. *Graham v. Connor*, 490 U.S. 386, 396–97 (1989); *see* U.S. Const. amend. IV. Deadly force is reasonable when an officer "has probable cause to believe that the suspect poses a significant threat of death or serious physical injury" to the officer or someone else. *Tennessee v. Garner*, 471 U.S. 1, 3 (1985). The jury must assess the existence or absence of probable cause based on the facts known to the officer at the moment he used force. *Thomas v. City of Columbus*, 854 F.3d 361, 365 (6th Cir. 2017). This reasonableness analysis includes a "built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case." *Burchett v Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002) (citing *Graham*, 490 U.S. at 396).

The plaintiff argues that the use of deadly force was objectively unreasonable because *Frazier* must have created the pop *himself*. She points out that the Ohio Bureau of Criminal Investigation was unable to "definitive[ly]" establish any source for the pop other than a gun. R. 167, Pg. ID 2707–08. And Garber was unarmed. So, she says, the only reasonable inference is that Frazier (the one officer inside the bedroom) fired a shot at Garber—creating the pop sound— and all the later shots followed from there. And because Frazier testified that he only felt the need to shoot *after* hearing the pop, this "pop shot" constituted the unlawful use of deadly force.

But reasonable jurors could have seen it differently. They could have credited Frazier's testimony when he said he didn't fire the "pop shot." *See McDonald v. Petree*, 409 F.3d 724, 731 (6th Cir. 2005) ("[W]itness credibility is solely within the jury's province, and this court may not remake credibility determinations." (cleaned up)). Or maybe they believed that one of the other officers created it. Or maybe they just weren't sure. In the end, the plaintiff bore the burden to convince the jury. *See id.* (affirming the denial of a new trial because, even though the movant had offered "the only medical evidence presented," that evidence was "not conclusive on the issue

of causation, and the jury did not have to accept it as true"). In short, while the jury could have ruled for the plaintiff, the evidence did not compel it to.

B.

Next, the plaintiff argues that the district court's exclusion of her expert, Melvin Tucker, constituted prejudicial error requiring a new trial. In his report, Tucker offered five opinions. He criticized (1) the officers' entry into the Garber home; (2) the officers' decision to confront Garber in his bedroom rather than communicate with him from a position of cover; (3) the officers' failure to properly respond to Garber's apparent suicide-by-cop attempt; (4) the officers' use of deadly force; and (5) the Sheriff's Office's internal review of the incident. R. 34-11, Pg. ID 1114–20. Frazier objected only to opinions (1) and (5), but the district court excluded the plaintiff's expert altogether (as well as Frazier's expert). *See HDM Flugservice GmbH v. Parker Hannifin Corp.*, 332 F.3d 1025, 1034 (6th Cir. 2003) ("[C]ourts may exclude evidence sua sponte."). In the district court's view, the expert testimony would not assist the jury because an ordinary person could comprehend the facts and issues of the case. R. 121, Pg. ID 2164 (citing *Salem v. U.S. Lines Co.*, 370 U.S. 31, 35 (1962)); *see* Fed. R. Evid. 702(a) (requiring the court to determine that the proffered expert testimony "will help the trier of fact to understand the evidence or to determine a fact in issue"). This was not an abuse of discretion.

*Opinions (1), (2), and (5).* Most of Tucker's proffered testimony was inadmissible because it was irrelevant to the sole issue before the jury: whether, at the moment that Frazier shot Garber, his use of deadly force was objectively reasonable. *See Graham*, 490 U.S. at 397. That eliminates Tucker's first two opinions that the officers made an unreasonable entry into the Garber home and failed to reasonably plan their tactical operation *before* putting themselves in danger. Even assuming that both are true, neither may be used to determine whether the later use of force was

reasonable. *Cnty. of Los Angeles v. Mendez*, 137 S. Ct. 1539, 1547 (2017); *Livermore* ex rel. *Rohm v. Lubelan*, 476 F.3d 397, 406 (6th Cir. 2007). And Tucker's evaluation of the internal investigation that was conducted *after* the shooting sheds no light on "the facts and circumstances confronting" Frazier when he shot Garber. *See Graham*, 490 U.S. at 397.

*Opinion (3).* The plaintiff presented no evidence to support the proposition that this was a "suicide by cop." So the officers' failure to follow standards for that situation was irrelevant. *See* Fed. R. Evid. 104(b) (requiring proof of facts necessary to establish relevance).

*Opinion (4).* Tucker's proffered testimony about whether Frazier used appropriate force was relevant but also beyond the expert's proper role: This part of the report told the jury what law to apply and which witnesses to believe. *United States v. Safa*, 484 F.3d 818, 821–22 (6th Cir. 2007) (explaining that expert witnesses may take over neither the role of judge nor of juror).

Tucker also laid out certain basic principles that officers learn about armed suspects; in short, though the presence of a firearm creates a "potential[]" threat to the officer, it is not alone sufficient to justify the use of deadly force. R. 34-11, Pg. ID 1117. This testimony falls within the "large gray area" of matters that "arguably fall within the realm of common knowledge and common sense," but that may sometimes be explained by expert testimony. 4 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 702.03[2][b] (Mark S. Brodin, ed., Matthew Bender 2020 LexisNexis ed.); *see Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 908–09 (6th Cir. 2004) ("Courts have permitted experts to testify about discrete police-practice issues when . . . their testimony assists the trier of fact."). The district court's determination that Tucker's testimony would not assist this particular jury was not "a clear error of judgment." *In re Scrap Metal*, 527 F.3d at 528. In any event, the plaintiff still could have put this information before the jury. The plaintiff called multiple officers to the stand, any of whom could have testified (as

lay witnesses) to what they had learned in training. *See* Fed. R. Evid. 702, advisory committee notes, 1972 proposed rules (noting that expert opinions may be "unhelpful" when they are "superfluous"). In short, excluding Tucker's testimony did not create an unfair trial.

We affirm.