NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0805n.06

Case No. 13-2373

**FILED**
Oct 23, 2014
DEBORAH S. HUNT, Clerk

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| LINDA MYS, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE WESTERN DISTRICT OF |
| MICHIGAN DEPARTMENT OF STATE | ) | MICHIGAN |
| POLICE, | ) | |
| | ) | OPINION |
| Defendant-Appellee. | ) | |
| | ) | |

BEFORE: SILER, BATCHELDER, and DONALD, Circuit Judges.

**BERNICE BOUIE DONALD, Circuit Judge**. Linda Mys appeals the district

court's evidentiary ruling in her Title VII lawsuit against her former employer, the Michigan

State Police Department. In her complaint, Mys alleged that the Department demoted her

and took numerous other retaliatory actions against her for lodging sexual harassment

complaints against a fellow officer. According to Mys, the Department's campaign of

unlawful retaliation against her continued over a period of four years, and culminated with its

decision to transfer her to Detroit, three hours away from her Sand Lake, Michigan home.

During the pre-trial proceedings, the district court determined that Mys could present

evidence that the Detroit transfer was retaliatory in nature, but ruled that the evidence

pertaining to all other retaliatory acts alleged in her complaint was inadmissible at trial. On

appeal, Mys argues that the district court's evidentiary ruling was erroneous, and that its effect on her ability to present her case to the jury was tantamount to a partial dismissal of her retaliation claim. For the reasons below, we **REVERSE** the district court's evidentiary ruling, **VACATE** the judgment, and **REMAND** for further proceedings consistent with this opinion.

I.

Linda Mys ("Mys") started her career with the Michigan State Police Department ("the Department") in 1987. In 1999, Mys was promoted from Trooper to Sergeant, and was assigned to the Newaygo post in the Department's Sixth District. Mys excelled in her career at the Newaygo post; she consistently received excellent performance reviews, and was eventually promoted by the head Post Commander to the position of "Acting Post Commander." According to Mys, things started to change in 2005, when one of her fellow officers, Sergeant Richard Miller ("Sgt. Miller"), began making unwanted sexual advances towards her at work. Mys alleges that Sgt. Miller made sexually charged comments towards her, which quickly escalated to inappropriate touching and demands for her attention. The situation with Sgt. Miller reached new lows in June 2005, when he allegedly showed up at her home uninvited and sexually assaulted her.

A. Sexual Harassment Complaint and Alleged Retaliation

On June 17, 2005, Mys discussed the sexual assault incident with a Department psychologist, Dr. Robert Wolford ("Dr. Wolford"). With Mys' permission, Dr. Wolford informed the Department's Internal Affairs division, which launched an investigation into the alleged incident.

Mys claims that the Newaygo Post Commander, Lieutenant Kevin Leavitt ("Lt. Leavitt") was furious when he learned about her allegations against Sgt. Miller. Mys contends that Lt. Leavitt initiated a campaign of retaliation against her, which began with her immediate demotion, followed by repeated incidents of unfair treatment, heightened scrutiny of her job performance, and reprimands for violating non-existent and/or selectively enforced office policies. On July 3, 2005, Lt. Leavitt relieved Mys of her title as "Acting Post Commander" and assigned her to the position of a "soft clothed" sergeant, which resulted in a loss of both pay and prestige. The following week, Mys used one of the Department's police vehicles to drive from the Newaygo post to the police headquarters in Lansing for a follow-up meeting with Internal Affairs. As she had done on numerous prior occasions, Mys wore a Department-issued polo shirt instead of her usual police uniform that day. On this occasion, however, Lt. Leavitt reprimanded her for driving a marked vehicle in a polo shirt, as opposed to her uniform, although he had never taken issue with her doing so before.

While the Internal Affairs investigation was still pending, Sgt. Miller called Captain Gary Gorski ("Captain Gorski"), the highest-ranking officer in the Sixth District, and reported that Mys appeared "suicidal." Captain Gorski communicated Sgt. Miller's reported concerns to the Department's Behavioral Sciences Division, which then called Mys to inquire about her emotional state. Mys contends that this was a calculated act of retaliation initiated by Sgt. Miller to embarrass her for having reported the sexual assault and to discredit her before the Department during the course of its investigation.

Following a short investigation, the Internal Affairs division concluded that "both parties [had] engaged in less than professional" conduct and that no further action was necessary to address the situation. (R. 34-2, IA Report of Investigation, June 24, 2005,

PageID #394.)  As a result, Mys continued working alongside Sgt. Miller at the Newaygo post, where Sgt. Miller allegedly escalated his inappropriate behavior.  Mys claims that Miller was emboldened by the Department's decision not to take action against him and started showing up at the post to harass her on days when he knew she was scheduled to work alone.

Mys further alleges that Lt. Leavitt's demeanor towards her during this period gave rise to a working environment that was "rife with tension and hostility."  She claims that Lt. Leavitt continued to treat her unfairly and issued unwarranted reprimands on several other occasions, such as yelling at her for taking time off to attend the visitation of a deceased family member.  On December 7, 2005, Mys decided to confront Lt. Leavitt about her belief that he was treating her unfairly.  When she implied that his hostility towards her was motivated by her complaint against Sgt. Miller, Lt. Leavitt allegedly responded by saying something like "you're right, things have changed."  Later that day, according to Mys, Lt. Leavitt also issued her a formal order to stop talking about the incident.

Several weeks later, in January 2006, Lt. Leavitt left the Newaygo post for another assignment, and Lieutenant Terry Harris ("Lt. Harris") took over as the Newaygo Post Commander.  On May 31, 2006 Mys complained to Lt. Harris that Sgt. Miller had been showing up at the post unscheduled while she was working there alone.  Mys alleges that Lt. Harris took no action, that Sgt. Miller continued to visit the post when she was there alone, and that Sgt. Miller continued to harass and touch her in subtle but inappropriate ways, even in front of other co-workers.  Mys claims that she complained to Lt. Harris once more on December 26, 2006, and again on January 3, 2007, but that nothing was done to address her repeated complaints.

Mys complained to Lt. Harris again in September 2007, citing two additional examples of Sgt. Miller's unprofessional conduct. Specifically, Mys told Lt. Harris that a few weeks earlier, an African American woman had come into the office to make a FOIA request, and that after the woman left the office, Sgt. Miller shouted something to the effect of, "what did that 'black biddy' want a POI for?" Mys also reported that the following day, Miller approached her while she was working on her computer and told her to "get off the porno site and run a plate on LEIN." Mys explained to Lt. Harris that she had not, in fact, been on a porno site, and that she was offended and embarrassed by Miller's comments. Lt. Harris responded that nothing could be done about Miller and that she would simply have to learn how to work with him.

### B. Second Complaint and Further Alleged Retaliation

On September 20, 2007, Mys decided to take medical leave, citing work-related stress. Frustrated by her Command's refusal to end Sgt. Miller's inappropriate behavior, Mys contacted Internal Affairs to request a second investigation into his alleged misconduct. Mys also mentioned Lt. Leavitt's hostility towards her during the first investigation and asked Internal Affairs to look into his handling of the incident as part of its second investigation.

Upon her return from medical leave, Lt. Harris instructed Mys to work out a new schedule that involved taking afternoon shifts, so that she would not have to work with Sgt. Miller. When Mys asked why she should be the one to change shifts instead of Miller, Lt. Harris allegedly laughed it off and told her to stop "listening to her female side."

Mys contends that Lt. Harris began setting her up for failure when he learned that she had requested a second investigation. For example, in October or November 2007, Lt. Harris

submitted the payroll to her for processing with several intentional errors. The payroll had an inaccurate entry in which Lt. Harris had put himself down for two weeks of vacation and four or five other errors concerning other employees' pay. When Mys asked Lt. Harris about the source of those errors, he allegedly explained that he had put them there on purpose to "test" her. (R. 27, Second Am. Compl., PageID #226.)

Around the same time, while the second Internal Affairs investigation was under way, Mys claims that Sgt. Miller's direct supervisor and close friend, Lieutenant Curt Schram ("Lt. Schram"), started rallying the other employees at the Newaygo post against her and initiated a campaign to discredit her as the second investigation was pending. Among other things, Lt. Schram allegedly spread a false rumor accusing Mys of releasing sensitive information about an ongoing investigation.

Meanwhile, the Department's Internal Affairs division conducted interviews with Mys, Sgt. Miller, Lt. Harris, Lt. Leavitt, and eight other employees at the Newaygo post. The report from those interviews shows that one officer corroborated Mys' complaints of Sgt. Miller's inappropriate touching, based on one specific occasion in which Miller had "accidentally" brushed up against Mys' leg and buttocks. (R. 34-3, IA Report of Investigation, Sept. 20, 2007, PageID #421-39.) The same individual also confirmed that it seemed as though Sgt. Miller found various excuses to show up at the post unscheduled when he knew that Mys was scheduled to be there. When asked to comment on whether Lt. Leavitt had retaliated against Mys for reporting Sgt. Miller's alleged harassment, the same officer stated that Lt. Leavitt had "serious problems with women." Four other individuals who were interviewed expressed the view that Sgt. Miller often spoke about sex and made inappropriate comments at work, but either denied or lacked knowledge as to whether his

behavior was targeted towards Mys. Another officer described Miller's behavior as "old school," but "not inappropriate."

At some point during the second investigation, Lieutenant Karla Christiansen ("Lt. Christiansen") from Internal Affairs contacted Mys and asked for permission to inquire with Dr. Wolford about their private consultations. Mys expressly declined Lt. Christiansen's request, but the Department allegedly ignored her wishes. A few days later, Dr. Wolford told Mys that Lt. Christiansen had spoken with her about a "hypothetical" situation, which left her name out of the conversation. When Mys asked Lt. Harris why Lt. Christiansen had been permitted to speak with Dr. Wolford without her consent, Lt. Harris responded that the decision was motivated by the Department's concerns about Mys' own safety and the safety of others at the Newaygo post.

On November 28, 2007, the Internal Affairs division sent Mys a letter indicating that it had completed its investigation; the letter also informed Mys of its conclusion that her allegations of ongoing harassment and unfair treatment were "unfounded."

Several days later, on December 3, 2007, Captain Gorski sent a letter to Major Barry Getzen ("Major Getzen") requesting that Mys be transferred out of the Newaygo post. The letter stated that "[t]he recent Internal Affairs investigation . . . revealed a working environment that is very uncomfortable and unproductive," and recommended that Mys be transferred to the nearby Rockford post. (R. 27-3, Second Am. Compl. Ex. B, PageID #265.) In an email to Major Getzen, Captain Gorski also mentioned the allegedly false rumor spread by Lt. Schram that Mys had released sensitive information about an ongoing investigation.

No one ever informed Mys that a request for her transfer had been made, nor did anyone say anything to her to suggest the possibility that she might be transferred. A few

days later, however, Mys attended a training session at the Police Academy in Lansing, where several officers from the Rockford post made comments suggesting that she was going to be working with them. This was the first time anyone had mentioned the possibility of a transfer to her, but the officers seemed certain that her name was on the following week's schedule at the Rockford post. Mys states that she was confused by this information, as it was against the Department's policy and usual course of operations to request a transfer without prior notice to the officer being reassigned. When she located Lt. Harris, who was also at the training, and asked him about the Rockford officers' comments, he confirmed that she was being transferred out of the Newaygo post and that her assignment to the Rockford post would take effect the following week. Upon seeing that Mys was visibly upset, Lt. Harris gave Mys permission to leave the training early. Mys claims that she felt humiliated by the way in which the Department proceeded with her transfer to Rockford and by the way in which she learned about her new assignment. Mys perceived it as a clear message that her Command had sided with Sgt. Miller in response to her repeated complaints.

Mys started working at the Rockford post on December 8, 2007. According to her complaint, however, Mys' troubles did not end with her transfer to Rockford. In January 2008, Mys received a letter from Lt. Leavitt's attorney, which threatened to sue her based on the statements she had made to Internal Affairs about him treating her unfairly. While assigned to the Rockford post, Mys also learned that Lt. Schram had inquired with her colleagues at the Rockford post about her performance, implying that she had engaged in some sort of misconduct. Mys claims that Lt. Schram had no reason for making these inquiries other than to cause trouble and to damage her reputation at the Rockford post.

Nevertheless, Mys came to view her assignment to the Rockford post as a positive change; the post was a similar distance from her home and she no longer had to interact with Sgt. Miller. Because her assignment was a "special circumstances transfer," however, she would have to attend a hearing before the Department's Transfer Review Board ("TRB") to have the transfer made permanent.

### C. TRB Hearing and Transfer to Detroit

When Mys appeared before the TRB on February 6, 2008, the Rockford post had an opening for a Sergeant and Mys informed the Board that she hoped to make that her permanent position. Mys also told the Board that she needed to remain in the vicinity of her home in Sand Lake so that she could continue to care for her ailing mother. Pursuant to the TRB's procedures, Mys suggested three possible locations for her assignment: she requested the Rockford post as her first choice, which was just 15 miles away from her home, followed by the Lakeview post (22 miles), and the Reed City post (45 minutes). The Department, however, suggested four other locations that were much farther away: Saugatuck (70 miles), Jackson (128 miles), Detroit (180 miles), and L'Anse (446 miles).

Lt. Schram also appeared before the TRB at Mys' hearing. Lt. Schram testified that Mys was the one who should be blamed for creating a hostile work environment at the Newaygo post and asked the Board to consider Mys' own "culpability" in bringing about the necessity for her reassignment. At the hearing, Lt. Schram also accused Mys of having released information about an ongoing investigation, citing the very rumor that Mys claims was made up to discredit her during the second Internal Affairs investigation.

In the end, the TRB assigned Mys to the Detroit post—a three-hour drive from her home in Sand Lake. The TRB noted that it had decided against the furthest location because

sending her there "would be clearly punitive," but gave no indication of its reason for not choosing the other locations that were closer to her home. Instead, the TRB sent Mys to the second furthest location—a post that Mys claims is widely referred to as the "penalty box" throughout the Department due to its reputation as one of the most stressful and dangerous assignments in the state.

When Mys reported for duty at the Detroit post on February 25, 2008, she was served with a two-year reprimand based on her "improper computer usage" at the Newaygo post. Apparently, after the TRB hearing, Lt. Schram had conducted a search of her old computer at the Newaygo post and written up all webpages in her browser history that were unrelated to work. As a result, Mys was ineligible to receive any promotion or salary increase for a period of two years. Mys claims that Lt. Schram had never searched any other officers' computers prior to this occasion and that he did not search any other officer's computer when he conducted the inquiry into her past computer use.

## II.

In August 2010, Mys filed a sexual harassment suit against the Department under Title VII of the Civil Rights Act, 42 U.S.C. § 2000, *et. seq*. The district court summarily dismissed Mys' sexual harassment claim, but allowed her to file an amended complaint and to proceed with her claim that the Department had engaged in unlawful retaliation against her, in violation of Title VII's anti-retaliation provision, § 2000e-3(a), as punishment for having made the sexual harassment complaints.

Prior to jury selection, the Department asked the court to rule on whether Mys would be permitted to present evidence to the jury concerning the details of the alleged harassment. The Department informed the court of its stipulation that Mys' sexual harassment complaints

qualified as "protected conduct" within the meaning of Title VII, and sought to bar any further evidence of the allegations in those complaints as more prejudicial than probative, Fed. R. Evid. 403, and irrelevant to her retaliation claim, Fed. R. Evid. 402. Mys' counsel did not dispute the exclusion of the sexual assault allegations against Sgt. Miller, but sought to present evidence of the numerous retaliatory actions that members of the Department allegedly took against her during and after the first investigation.

After a short back-and-forth between the parties, the district court ultimately ruled that the proof would be limited to reflect only what the TRB had considered and the events that transpired after Mys' transfer to the Detroit post. The district court explained that the only issue being tried was whether the transfer to Detroit had been retaliatory, and that all other retaliatory acts alleged in Mys' complaint were related to the harassment claim that it had previously dismissed.

Mys' counsel then sought clarification as to whether Mys could present evidence on the circumstances surrounding her transfer to Rockford, and whether she could challenge Lt. Schram's testimony at the TRB hearing in order to show that he had fabricated the rumor about her releasing sensitive information. The district court reiterated its view that everything prior to the TRB hearing was irrelevant to Mys' retaliation claim for one reason or another. The subsequent exchange between the district court and Mys' counsel proceeded as follows:

> [COUNSEL]: . . . . [I]t's not just the TRB. There's also two officers that kind of led up to the TRB. . . . [Lt. Schram] . . . really initiated a lot of the stuff here and then . . . Captain . . . Gorski that did a lot too.
>
> THE COURT: But . . . that is conduct . . . that was part of the harassment complaint that's been dismissed. I don't see how that's relevant to the transfer. . . . [W]hat . . . [the TRB] hear[s] is what they are deciding on. . . . [S]o

- 11 -

if we're trying to test whether the [TRB] is making a retaliatory decision, I don't think you can go into . . . all the stuff they didn't hear.

[COUNSEL]: But there was also a transfer to the Rockford post that occurred before the [TRB] did as it did. The sequence of events was she was at Newaygo, Schram and Gorski got her transferred to Rockford. While she's at Rockford the TRB gets convened, and then the TRB echoes a lot of the things that Schram and Gorski did to get her transferred to Rockford and then sends her to Detroit. So we've got two different transfers here. We need to talk about Schram and Gorski to get to the transfer from Newaygo to Rockford. . . .

THE COURT: . . . . [T]hat's not something that's part of the retaliatory theory, is it? . . . . She wanted to get out of Newaygo, right? And the question was where, and the question is . . . was it retaliatory to send her three hours away, away from her mother . . . ? [T]he hinge issue here is retaliation, it seems to me, in terms of the transfer to Detroit, and that's what the case rises and falls on. And maybe what happened to her once she got to Detroit if that's part of your constructive discharge theory. . . . [B]eyond that, I don't see how you're doing anything but backing into a sexual harassment claim. . . . So that's my ruling. You know, we'll have to see how the actual proofs come in. . . . [W]hat the [TRB] hears, maybe that's okay. I think it comes in even if it touches on underlying allegations. Other than that, I'm not going to have proofs that go into essentially trying the veracity of everything . . . . So beyond that, . . . [i]t's going to depend a little bit on what I see as it comes in. But that's the line I'm going to be trying to hew . . . .

[COUNSEL]: Given that statement, may I still rely on our theory about Schram and Gorski and the Rockford transfer in my opening? . . . .

THE COURT: . . . . I don't think that counts. That, as a matter of law, is not enough to establish a retaliation under Title VII . . . because it's not something that would dissuade a reasonable person from making a complaint. A transfer to Detroit when you're in West Michigan and your mother is here and sick . . . , I think that could. But not something that moves you down the road an hour.

(R. 72, Appeal Tr. of Two Excerpts from Vol. I of Jury Trial, PageID #678-83.) Based on the foregoing, the district court permitted Mys to present evidence at trial only from the recording of the TRB hearing and the events that ensued after the hearing. The jury was

therefore precluded from hearing about everything else that happened over the two-and-a-half-year period between Mys' first complaint against Sgt. Miller and her special circumstances transfer to Rockford.

After a two-day trial, the jury delivered a verdict for the Department, finding that it had not engaged in unlawful retaliation against Mys. Mys then filed this appeal challenging the district court's pre-trial evidentiary ruling.

On appeal, Mys argues that the district court's exclusion of all evidence concerning the events that transpired prior to her transfer to Detroit prevented her from properly presenting her case.

### III.

### A. Standard of Review

We review a district court's rulings on the admissibility of evidence under the abuse of discretion standard. *See Old Chief v. United States*, 519 U.S. 172, 174 n.1 (1997); *Dortch v. Fowler*, 588 F.3d 396, 400 (6th Cir. 2009) (citing *United States v. Wagner*, 382 F.3d 598, 616 (6th Cir. 2004)). Reversal is only warranted if the Court is "firmly convinced" that a mistake was made, and that the mistake was not "harmless error." *Pressman v. Franklin Nat'l Bank*, 384 F.3d 182, 187 (6th Cir. 2004). Even if this Court finds error in the district court's ruling, reversal is not warranted unless the exclusion of evidence caused substantial prejudice to the party seeking its admission. *See In re Air Crash Disaster*, 86 F.3d 498, 526 (6th Cir. 1996). "There is no prejudice from the wrongful exclusion of evidence 'if other substantially equivalent evidence of the same facts [was] admitted into evidence.'" *Id.* (alteration in original) (quoting *Leonard v. Uniroyal, Inc.*, 765 F.2d 560, 567 (6th Cir. 1985)). "Nor is there prejudice if the absence of the evidence had no effect on the final result of the trial." *Id.*

B. Title VII Retaliation, 42 U.S.C. § 2000e-3(a)

Title VII of the Civil Rights Act prohibits various forms of workplace discrimination, including sexual harassment, and makes it unlawful for an employer to retaliate against an employee for raising complaints about workplace conditions covered by the statute. *See* 42 U.S.C. § 2000e-3(a); *see also Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014) (explaining that the statute's anti-retaliation provision incorporates both formal discrimination charges as well as less formal complaints to management in its definition of "protected activities.").

In the instant case, it is undisputed that Mys' repeated complaints of Sgt. Miller's inappropriate behavior—both her formal complaints to Internal Affairs as well as her complaints to managers at the Newaygo post—qualify as "protected conduct" under Title VII; the Department stipulated as much, and the only issue at trial was whether the alleged retaliatory acts described in her complaint amounted to unlawful retaliation within the meaning of 42 U.S.C. § 2000e-3(a). Accordingly, in order to establish that the Department engaged in unlawful retaliation, Mys had to demonstrate that her employer took one or more retaliatory actions against her that it would not have otherwise taken but-for her having made complaints about Sgt. Miller's perceived harassment. *Laster*, 746 F.3d at 731 (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013)). An action is considered to be retaliatory if it is "materially adverse," meaning that the action might have "dissuaded a reasonable worker" from complaining of unlawful working conditions. *Id.* (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)) (internal quotation marks omitted).

C. Admissibility of Alleged Retaliatory Acts

The allegations in Mys' complaint can be grouped into four broad categories: (1) her initial allegations against Sgt. Miller with regard to the sexual assault incident in 2005; (2) the alleged retaliatory actions taken against her by Lt. Leavitt and Sgt. Miller during and after the first Internal Affairs investigation; (3) the alleged retaliatory actions following her request for a second investigation, which includes the circumstances surrounding her transfer to the Rockford post; and (4) the TRB hearing, her involuntary transfer to Detroit, and the events that followed. With respect to the first category, the parties agreed that details of the alleged sexual assault incident should not be admitted at trial, as those allegations were more prejudicial than probative to Mys' retaliation claim. Indeed, because those incidents occurred prior to her first complaint, those allegations were more or less irrelevant to her retaliation claim. Everything that happened after Mys filed her first complaint, however, was at least relevant to her retaliation claim insofar as those incidents occurred after her first complaint.

The district court allowed evidence from only the fourth category, permitting Mys to present a narrow retaliation theory based on the transfer to Detroit, but excluding evidence of all the other retaliatory acts alleged in her complaint that occurred prior to the TRB hearing. Mys argues that the retaliatory actions taken against her prior to the TRB hearing were essential to her retaliation claim and necessary to illustrate the context in which the TRB arrived at its decision. Because she was not permitted to present those incidents as evidence of her employer's unlawful retaliation, Mys argues the district court's evidentiary rulings prevented her from making her case to the jury.

(i) Admissibility of Alleged Retaliatory Acts Resulting from
Mys' Initial Complaint against Sgt. Miller

Mys claims that the Department's unlawful retaliation began with her demotion and devolved into an atmosphere of overall hostility, perpetrated by Lt. Leavitt's targeted reprimands and Sgt. Miller's ongoing, unchecked harassment. The district court ruled that these incidents were irrelevant to her retaliation claim because they were part and parcel of her sexual harassment claim, which it had already dismissed.

With respect to Mys' demotion, the district court's exclusion of that evidence in particular was prejudicial error as it went directly to her retaliation claim. As for her allegations concerning Lt. Leavitt's subsequent unfair treatment, this Court has held that "heightened scrutiny" of job performance, including discipline for selectively enforced policies following a complaint, can support a claim of unlawful retaliation if such actions would dissuade a reasonable worker from complaining of workplace harassment. *Laster*, 746 F.3d at 732.

The district court's decision to exclude evidence that Sgt. Miller engaged in retaliatory harassment and intimidation tactics after Mys reported his alleged misconduct to Internal Affairs is more complicated. This Court has recognized that harassment by coworkers can support a claim of unlawful retaliation in certain circumstances, if the coworker's actions are "sufficiently severe so as to dissuade a reasonable worker from making or supporting a charge of discrimination" and if management is aware of the coworker's retaliatory behavior, but "manifests indifference or unreasonableness" in its failure to respond to such circumstances. *Id.* (citing *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 347 (6th Cir. 2008)).

In *Laster*, this Court also made clear that treatment by coworkers that is not severe enough to sustain a substantive claim of harassment or discrimination may still support a retaliation claim because the threshold for establishing that an action is "materially adverse" is substantially "less onerous" in the retaliation context. *Id.* at 731 (quoting *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 595-96 (6th Cir. 2007)) (internal quotation marks omitted). "This more liberal definition permits actions not materially adverse for purposes of an anti-discrimination claim to qualify as such in the retaliation context." *Id.* at 731-32 (quoting *Michael*, 496 F.3d at 596).

Putting aside whether Sgt. Miller's alleged harassment fits that definition, this Court's cases make clear that evidence offered to support a substantive claim of sexual harassment may also be offered to establish unlawful retaliation. *See id.* Accordingly, the district court's ruling that Mys could not present evidence of Sgt. Miller's alleged harassment to support her retaliation simply because she had cited the same incidents to support her previous sexual harassment claim was erroneous. If the district court's reasoning had been based on other relevancy and prejudice concerns, then our analysis might be different. Applying the "more liberal definition" of "adverse actions" in the context of Mys' retaliation claim, however, we cannot accept the district court's conclusion that Sgt. Miller's alleged retaliatory acts were wholly irrelevant to Mys' retaliation claim.

### (ii) Admissibility of Alleged Retaliatory Acts Stemming from Mys' Request for a Second Internal Affairs Investigation

The events Mys sought to admit as evidence of further retaliation following the second investigation mostly revolved around her transfer to the Rockford post—i.e., the fact that it was involuntary, that the Department's failure to notify her violated its own policies,

and that the manner in which it was carried out was intended to punish and humiliate her before her colleagues. Mys also sought to admit evidence that Sgt. Miller and Lt. Schram conspired to tarnish her reputation by spreading false rumors about her, which were then cited in Captain Gorski's request for her transfer to Rockford, and that Lt. Schram took further steps to damage her relations with officers at the Rockford post. The district court's decision to exclude all this evidence was based on its view that Mys' transfer to the Rockford post was not a "materially adverse" action within the meaning of Title VII's anti-retaliation provision.

As an initial matter, we note that the district court's reasoning categorically excluded all evidence surrounding Mys' transfer to Rockford without specifically analyzing whether the particular manner in which the transfer was initiated was retaliatory in nature, apart from the fact of her being transferred. This was error at least insofar as the district court failed to distinguish between the fact of her transfer to Rockford, which it declined to view as "materially adverse," and the context in which the transfer was carried out.

With respect to the transfer itself, the district court's legal conclusion that Mys' transfer to Rockford could not be considered "materially adverse" for purposes of her retaliation claim also constitutes error. The district court reasoned that Mys was precluded from arguing that her transfer to Rockford was "materially adverse" because she ended up viewing it as a positive change in her working conditions.

The district court's analysis on this point was inconsistent with the Supreme Court's definition of "materially adverse" actions in *Burlington*, 548 U.S. at 68, and contrary to this Court's subsequent cases, which explain that an employee need not show actual harm resulting from an employer's action in order to establish that such action was materially adverse. *See,*

*e.g.*, *Michael*, 496 F.3d at 596 (finding that paid administrative leave may be viewed as a materially adverse action even though the employee suffers no direct harm); *Deleon v. City of Kalamazoo*, 739 F.3d 914, 918-19 (6th Cir. 2014) (finding that an employee's involuntary transfer to a position, for which he had actually applied in the past, could nonetheless be viewed "materially adverse" action in light of the circumstances surrounding the assignment). Applying the framework from those cases to the instant facts, it is apparent that the district court should have allowed Mys to argue that her transfer to Rockford and the circumstances surrounding that transfer were "materially adverse" actions in the context of her retaliation claim.

IV.

Taken together, we find that the district court's exclusion of such fundamental aspects of Mys' case constitutes reversible error. The district court's exclusion of all evidence unrelated to the Detroit transfer precluded Mys from presenting evidence to support the vast majority of the allegations in her complaint. Under these circumstances, it is impossible to ascertain whether the jury would have arrived at a different conclusion if it had been presented with a more complete version of the relevant evidence. Accordingly, we **REVERSE** the district court's evidentiary ruling, **VACATE** the judgment, and **REMAND** for further proceedings consistent with this opinion.