RONALD LEE GILMAN, Circuit Judge.
A jury found that the Michigan Department of State Police (the Department) had retaliated against Linda Mys, a former desk sergeant with the Department, by transferring her from her longtime post in Newaygo, Michigan, to a post in Detroit. Department officials initiated the process that culminated in Sgt. Mys's transfer shortly after she had filed the second of two complaints alleging sexual assault and sexual harassment by Sgt. Richard Miller, one of her coworkers. Sgt. Mys was awarded $350,000 in compensatory damages.
On appeal, the Department argues that the district court erred in denying (1) its motion for judgment as a matter of law or, in the alternative, for a new trial; and (2) its motion for a remittitur. The Department thus disputes that the trial record contains any evidence from which a reasonable jury could have found in Sgt. Mys's favor or upon which the jury's award could be justified.
Contrary to the Department's assertions, the record contains ample evidence that supports the jury's verdict and award. We therefore AFFIRM the judgment of the district court.
I. INTRODUCTION
A. Factual background
1. Sgt. Mys assigned to the Newaygo post
Sgt. Mys joined the Department as a trooper in 1987, and she began working at the Newaygo post in 1999 upon her promotion to sergeant. She subsequently bought a home in Sand Lake, Michigan, which is 15 miles from the Newaygo post. Her permanently disabled mother then moved to Howard City, which is eight miles from Sand Lake, so that Sgt. Mys could care for her.
2. Sexual-assault and sexual-harassment complaints
In 2005, Sgt. Mys alleges that she became the object of unwanted sexual advances *595 by Sgt. Miller. This conduct reached its nadir in June of that year, when Sgt. Miller allegedly showed up uninvited to Sgt. Mys's house and sexually assaulted her. An internal investigation, however, deemed those allegations "nonsustained," meaning that the available evidence neither confirmed nor dispelled them. The Department therefore took no action against Sgt. Miller. Sgt. Mys filed a second complaint against Sgt. Miller in 2007, alleging continued sexual harassment, but the subsequent investigation determined that her allegations were "unfounded." A more in-depth account of these events is set forth in our prior opinion in this case, Mys v. Michigan Department of State Police , 590 Fed.Appx. 471, 472-475 (6th Cir. 2014).
3. The Department temporarily assigned Sgt. Mys to the Rockford post while seeking her permanent transfer elsewhere.
During the events relevant to this case, Captain (now Colonel) Gary Gorski was the highest-ranking officer in the Department's Sixth District, which encompasses the Newaygo post. As such, he participated in and recommended the ultimate outcome of both internal investigations initiated by Sgt. Mys's complaints. Before the second investigation's results had even been finalized, Cpt. Gorski emailed his direct supervisor, Major Barry Getzen, and a human-resources director with the Department, Debbie Gilmore, to request that Sgt. Mys be assigned to a different post.
This request was based on a process called a "special circumstances transfer," which is governed by the Collective Bargaining Agreement (CBA) negotiated between the Department and its employees' union, the Michigan State Police Troopers Association. Cpt. Gorski explained that a transfer was necessary due to Sgt. Mys's complaints against Sgt. Miller:
This is the third time she, Linda Mys, has filed a UD-93 [formal complaint] on Detective Sergeant Miller in the past two years. I am confident that complete and thorough investigations were completed resulting in none of the allegations being sustained.
(Although Cpt. Gorski and other Department officials at times refer to three complaints filed by Sgt. Mys, only two were discussed at trial.) Cpt. Gorski continued:
She [Sgt. Mys] has made allegations of a hostile work environment. I believe that the Newaygo post is a hostile work environment. This occurs only when Sergeant Mys is working.
...
She is detrimental to the continued effective operation of the post and has lost her credibility.
Despite Sgt. Mys's allegations against Sgt. Miller, Cpt. Gorski never considered seeking Sgt. Miller's transfer instead of hers. Before either Sgt. Mys or Lt. Terry Harris (the Newaygo post Commander) had been notified of the second internal investigation's outcome, Cpt. Gorski contacted Robert Wolford, a departmental psychologist who had been working with Sgt. Mys, to give him a "heads-up" about the investigation's findings and the impending transfer.
Roughly one week later, Cpt. Gorski emailed Maj. Getzen to request that Sgt. Mys be temporarily assigned to Rockford, another Sixth District post, until the Department reached a final determination on the requested transfer. Cpt. Gorski's email explained that the temporary assignment was necessary because the internal investigation had "revealed a working environment that is very uncomfortable and unproductive for Sergeant Linda Mys and others at the Newaygo post."
*596 After Maj. Getzen approved the temporary reassignment, Cpt. Gorski intended for Lt. Harris to notify Sgt. Mys of her assignment to Rockford. She instead found out while at a departmental training session in Lansing, when troopers from the Rockford post told her that they had heard that she would be joining their post in less than 48 hours. The manner in which Sgt. Mys found out about the transfer embarrassed and distressed her because she felt that it "made [her] look very bad," and that she was being "bull[ied]" by the Department.
4. Sgt. Mys transferred to the Detroit post
Although Sgt. Mys initially opposed her temporary reassignment to Rockford, she found that she enjoyed the new post, got along well with her new colleagues, and that being away from Sgt. Miller greatly relieved the stress that she had been experiencing while stationed in Newaygo. The posting also allowed her to continue caring for her mother because Rockford and Newaygo are equidistant from her home in Sand Lake. A permanent desk-sergeant position was open at the Rockford post, so Sgt. Mys decided not to contest the Department's pursuit of a "special circumstances transfer," although she had the right to do so under the CBA. She hoped that the Department would allow her to remain at the Rockford post if she did not contest the transfer from Newaygo.
The CBA empowers a Transfer Review Board (TRB) to make decisions about transfers within the Department. When the TRB convened to rule on Sgt. Mys's proposed transfer, it was comprised of three members designated by the Department and two by the employees' union. Because Sgt. Mys did not dispute that special circumstances existed to justify her transfer, the TRB's sole task at her hearing was to select a permanent transfer location.
The CBA restricts the TRB's selection of posts to a list comprised of up to six posts requested by the employee and up to four posts requested by the Department. In addition to the Rockford post, Sgt. Mys requested the Lakeview or Reed City posts, which are both within the Sixth District. The Department requested the Wayland, Jackson, Detroit, or L'Anse posts, all of which are outside of the Sixth District and are located at much greater distances from Sgt. Mys's home than the Newaygo or Rockford posts (see Table 1 below).
*597 Table 1
Post Distance from Sgt. Mys's House Newaygo 15 miles Rockford 15 miles Lakeview 22 miles Reed City 46 miles Wayland 70 miles Jackson 128 miles Detroit 180 miles L'Anse 446 miles
Sgt. Mys made a statement at the TRB hearing in which she related her positive experience at the Rockford post and expressed her strong desire to remain there. In contrast, she specifically explained her opposition to being placed at the Wayland post, the site that was closest to her home of the four designated by the Department, because of the stress that it would place on her caretaking responsibilities. Based on her objection to the Wayland post, one can assume that she also objected to the Department's other proposed locations that are even farther away.
Lt. Curt Schram, who supervised Sgt. Miller, spoke at the hearing on behalf of the Department. Cpt. Gorski and Lt. Schram discussed the latter's testimony before the hearing commenced. Lt. Schram recited the two factors that the CBA specifies are to guide the TRB's selection of a transfer destination: (1) seniority, the "primary factor," and (2) "the employee's level of responsibility in necessitating the transfer," a "lesser factor," which Lt. Schram paraphrased as the employee's "culpability."
As for Sgt. Mys's seniority, Lt. Schram briefly noted that "Sgt. Mys has almost nine years of seniority as a sergeant. The median age for sergeants ... is just over eight years, and, as you [the TRB] are aware, there is no transfer roster." Lt. Schram then devoted the bulk of his statement to addressing the "lesser" of the two factors guiding transfer-destination decisions by listing several alleged manifestations of Sgt. Mys's "culpability." He specifically mentioned the complaints that she *598 had filed against Sgt. Miller, her reluctance to work in Sgt. Miller's presence, and the responsibility that she bore for creating a "hostile work environment" at the Newaygo post.
Although the CBA does not specify departmental staffing needs as a factor to be considered in selecting a transfer destination, Lt. Schram urged the TRB to discount Sgt. Mys's preferred posts on that basis. He noted that because there were no openings for sergeants in Lakeview or Reed City, transferring Sgt. Mys to either of those two posts would require the Newaygo post to give up a sergeant position. As for the Rockford post, Lt. Schram argued against allowing Sgt. Mys to remain there because desk sergeants at that post provide backup supervision for the Newaygo post and because Sgt. Mys had previously blamed one of the sergeants stationed at Rockford for a trooper's death in the line of duty.
After conferring, the TRB rejected all of Sgt. Mys's preferred locations on the ground that she would be best served by a "fresh start" outside of the Sixth District. The TRB also rejected L'Anse as a transfer location, concluding that its 446-mile distance from Sgt. Mys's home would make a transfer there "maybe punitive." Wayland was not among the transfer locations that the TRB considered in rendering its final decision. As between Jackson and Detroit, the TRB selected Detroit on the ground that it was closer to Sgt. Mys's home, even though Jackson is actually more than 50 miles closer.
Sgt. Mys worked at the Detroit post for two-and-a-half years. In light of her mother's needs, Sgt. Mys both maintained her home in Sand Lake and rented an apartment in Ypsilanti, near Detroit. She travelled home whenever she could to be with her mother. Eventually, though, she was unable to continue this burdensome arrangement. Sgt. Mys therefore incurred the costs necessary to have her pension vest early so that she could retire 12 years before she had intended to do so. This decision extinguished her dream of becoming the longest-tenured female officer to serve with the Department.
B. Procedural background
The trial now under review is the second trial in this case. A previous jury returned a verdict in favor of the Department. Mys v. Mich. Dep't of State Police , 590 Fed.Appx. 471, 478 (6th Cir. 2014). But this court vacated that judgement and remanded the case for further proceedings after finding that the trial court had erroneously excluded all evidence of retaliation before Sgt. Mys's ultimate transfer to Detroit. Id. at 479-81.
At the close of Sgt. Mys's case-in-chief in the second trial, the Department moved for judgment as a matter of law under Rule 50(a) of the Federal Rules of Civil Procedure, arguing that Sgt. Mys had failed to present sufficient evidence to establish that her complaints were the but-for cause of her transfer, as required to prove her Title VII retaliation claim. The district court took the motion under advisement pending a verdict in the case. Returning a verdict in Sgt. Mys's favor, the jury awarded her $350,000 in compensatory damages.
After the conclusion of the trial, the Department filed a post-verdict motion that renewed its motion for judgment as a matter of law under Rule 50(b) or, in the alternative, moved for a new trial under Rule 59. The Department also moved in the alternative for the award to be remitted to an amount of no more than $150,000. Following briefing, the district court denied both of the Department's post-verdict motions. This timely appeal followed.
*599 II. ANALYSIS
A. Misstatements of fact by counsel for the Department
As a preliminary matter, we note that our ascertainment of the relevant facts in this case was impeded by several statements made during oral argument by counsel for the Department that mischaracterized the record. For instance, she incorrectly stated the composition of the TRB, wrongly asserted that there was no evidence in the record that there was a desk-sergeant opening at Rockford at the time of the TRB hearing, wrongly contended that Wayland was in the Sixth District, and wrongly claimed that the final TRB decision came down to a choice between Wayland and Detroit, rather than between Jackson and Detroit. All of these misstatements in context cut in favor of her client. Even assuming that these instances amounted to sloppiness rather than an intent to mislead, they do not meet the professional standard for preparation and argument before this court.
B. Motion for judgment as a matter of law/new trial
1. Standards of review
We now turn to the merits of this appeal. A district court may grant a motion for judgment as a matter of law under Rule 50(b) of the Federal Rules of Civil Procedure"only if[,] in viewing the evidence in the light most favorable to the non-moving party, there is no genuine issue of material fact for the jury, and reasonable minds could come to but one conclusion, in favor of the moving party." Radvansky v. City of Olmsted Falls , 496 F.3d 609, 614 (6th Cir. 2007) (quoting Gray v. Toshiba Am. Consumer Prods., Inc. , 263 F.3d 595, 598 (6th Cir. 2001) ). We review de novo the district court's application of Rule 50(b). K & T Enters., Inc. v. Zurich Ins. Co. , 97 F.3d 171, 175 (6th Cir. 1996). "[I]n entertaining a motion for judgment as a matter of law, the court should review all of the evidence in the record ... [,] draw[ing] all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods., Inc. , 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).
Similarly, a district court may grant a motion for a new trial under Rule 59 of the Federal Rules of Civil Procedure if it "determines that the verdict is clearly against the weight of the evidence." Denhof v. City of Grand Rapids , 494 F.3d 534, 543 (6th Cir. 2007). We review a district court's denial of a new trial under the abuse-of-discretion standard, reversing only if we have a "definite and firm conviction that the trial court committed a clear error of judgment." Barnes v. Owens-Corning Fiberglas Corp. , 201 F.3d 815, 820 (6th Cir. 2000) (quoting Logan v. Dayton Hudson Corp. , 865 F.2d 789, 790 (6th Cir. 1989) ).
2. Title VII retaliation
Sgt. Mys's sole claim in this case is that the Department unlawfully retaliated against her for the complaints that she had filed against Sgt. Miller. (For the sake of brevity, we will refer to the separate complaints of sexual assault and sexual harassment collectively as "sexual-harassment complaints.") Title VII of the Civil Rights Act of 1964 prohibits employers from retaliating against employees for complaining about employment practices, such as sexual harassment, that are outlawed by the statute. 42 U.S.C. § 2000e-3(a) ; Laster v. City of Kalamazoo , 746 F.3d 714, 729-30 (6th Cir. 2014). A prima facie case of Title VII retaliation requires proof that "(1) ... [the plaintiff] engaged in activity protected by Title VII; (2) h[er]
*600 exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was 'materially adverse' to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action." Laster , 746 F.3d at 730 (quoting Jones v. Johanns , 264 Fed.Appx. 463, 466 (6th Cir. 2007) ). The final element requires proof of so-called "but-for" causation, meaning that the plaintiff must furnish evidence that "the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." Univ. of Tex. Sw. Med. Ctr. v. Nassar , 570 U.S. 338, 360, 133 S.Ct. 2517, 186 L.Ed.2d 503 (2013).
When an employee's supervisor directly retaliates against the employee, the employer is vicariously liable for the supervisor's unlawful actions. Faragher v. City of Boca Raton , 524 U.S. 775, 780, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). A supervisor for the purposes of vicarious liability under Title VII is someone who "is empowered by the employer to take tangible employment actions against the victim." Vance v. Ball State Univ. , 570 U.S. 421, 424, 133 S.Ct. 2434, 186 L.Ed.2d 565 (2013). Cpt. Gorski, the highest ranking official in the Sixth District, was Sgt. Mys's supervisor. See id.
Although Cpt. Gorski initiated the process that culminated in Sgt. Mys's transfer, it was the TRB, not Cpt. Gorski, that made the ultimate decision to transfer her to Detroit. But that does not necessarily defeat Sgt. Mys's claim. An employer is also vicariously liable for retaliation that a supervisor initiates against an employee by causing another actor, that might itself lack retaliatory animus, to take an adverse action against the employee. Staub v. Proctor Hosp. , 562 U.S. 411, 420-23, 131 S.Ct. 1186, 179 L.Ed.2d 144 (2011) (holding that an employer may be liable for discrimination under the Uniformed Services Employment and Reemployment Rights Act of 1994 (USERRA) where an employee's supervisors made complaints, motivated by hostility to the employee's reserve-duty obligations, to the human-resources director, who in turn fired the employee based on those complaints).
Under this so-called "cat's paw" theory of liability (a reference to one of Aesop's Fables in which a monkey tricks a cat into pulling chestnuts out of a fire for him), "if a supervisor performs an act motivated by [retaliatory] animus that is intended by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable under [Title VII]." Id. at 415 n.1, 422, 131 S.Ct. 1186 (emphasis in original) (footnote omitted); see also Chattman v. Toho Tenax Am., Inc. , 686 F.3d 339, 351 n.10 (6th Cir. 2012) ("While Staub dealt with a discrimination claim pursuant to [USERRA], the Court's reasoning applies with equal force to claims brought under Title VII."). "Proximate cause requires only 'some direct relation between the injury asserted and the injurious conduct alleged,' and excludes only those 'link[s] that are too remote, purely contingent, or indirect.' " Staub , 562 U.S. at 419, 131 S.Ct. 1186 (alteration in original) (quoting Hemi Grp., LLC v. City of New York , 559 U.S. 1, 9, 130 S.Ct. 983, 175 L.Ed.2d 943 (2010) ). Because Cpt. Gorski initiated Sgt. Mys's transfer, even though the TRB took the ultimate action, this case is an example of the "cat's paw" theory in action. See id. at 422, 131 S.Ct. 1186.
3. The record contains sufficient evidence that Cpt. Gorski indirectly retaliated against Sgt. Mys through the TRB.
Of the four elements of an employment-retaliation claim, only the causation prong *601 is contested by the Department on appeal. The Department concedes that Sgt. Mys filed sexual-harassment complaints against Sgt. Miller with the Department's Internal Affairs Division, which is a clear example of conduct protected by Title VII. See Laster , 746 F.3d at 730 ("The opposition clause [of 42 U.S.C. § 2000e-3(a) ] protects not only the filing of formal discrimination charges with the EEOC, but also complaints to management and less formal protests of discriminatory employment practices.").
Moreover, the Department properly conceded at oral argument that the long distance of the Detroit post from Sgt. Mys's home made her transfer there an adverse employment action. This concession reflects this court's holding "that an employee's transfer may constitute a materially adverse employment action, even in the absence of a demotion or pay decrease, so long as the particular circumstances present give rise to some level of objective intolerability." Deleon v. Kalamazoo Cty. Rd. Comm'n , 739 F.3d 914, 919 (6th Cir. 2014) ; cf. Mattei v. Mattei , 126 F.3d 794, 808 (6th Cir. 1997) ("[I]f an employer, annoyed over an employee's insistence on receiving certain ERISA benefits, transferred her (at the same salary) to some wretched backwater, that would clearly constitute a valid retaliation claim.").
The remaining questions, therefore, are twofold: First, does the record contain evidence from which a reasonable jury could have found a but-for causal connection between Sgt. Mys's filing of complaints against Sgt. Miller and her ultimate transfer to Detroit? See Nassar , 570 U.S. at 360, 133 S.Ct. 2517. And second, was Cpt. Gorski's retaliatory animus toward Sgt. Mys (if it existed) the proximate cause for the TRB's decision to transfer her there? See Staub , 562 U.S. at 422, 131 S.Ct. 1186.
The jury need only have taken Cpt. Gorski at his word to find a but-for causal connection. He initiated the transfer process with explicit reference to Sgt. Mys's complaints, explaining to both his superior and the Human Resources Department that Sgt. Mys's transfer was necessary for one reason and one reason only: her sexual-harassment complaints. These complaints, Cpt. Gorski argued, had created a "hostile work environment" at the Newaygo post and had undermined both "the continued effective operation of the post" and Sgt. Mys's "credibility."
In fact, Sgt. Mys's status as a sexual-harassment-complaint recidivist so strongly justified her transfer in Cpt. Gorski's eyes that he initiated the transfer process before the internal investigation into her second complaint had even concluded. The jury's finding that the TRB would never have been convened had it not been for Sgt. Mys's complaints was neither unreasonable nor "clearly against the weight of the evidence." Denhof v. City of Grand Rapids , 494 F.3d 534, 543 (6th Cir. 2007) ; see also Radvansky v. City of Olmsted Falls , 496 F.3d 609, 614 (6th Cir. 2007). Indeed, the Department conceded at oral argument that Cpt. Gorski was responsible for the convening of the TRB.
And although the TRB, not Cpt. Gorski, wielded the ultimate power to decide where to relocate Sgt. Mys, Cpt. Gorski's desire to have her transferred to one of the Department's preferred and more distant posts was hardly "remote" from the TRB's proceedings. See Staub , 562 U.S. at 419, 131 S.Ct. 1186 (quoting Hemi Grp., LLC , 559 U.S. at 9, 130 S.Ct. 983 ). Cpt. Gorski identified the Department's preferred transfer locations in conjunction with his superiors. True enough, Lt. Schram rather than Cpt. Gorski spoke on the Department's behalf before the TRB, but only after the two had discussed Lt.
*602 Schram's testimony in advance. And Lt. Schram's testimony overwhelmingly focused on the "lesser" of the two factors that the CBA allows to be considered in transfer-destination decisions-"the employee's level of responsibility in necessitating the transfer." He barely mentioned the "primary factor" of Sgt. Mys's above-average seniority as a sergeant.
Lt. Schram instead presented the TRB with a long list of "culpable" acts that Sgt. Mys had allegedly committed, many of which Cpt. Gorski never mentioned in his email that initiated the transfer process. These previously unmentioned acts included Sgt. Mys's refusal to answer the telephone while working overtime on the weekend, unspecified "vindictive[ness]" toward and "intimidation" of troopers under her supervision, and an emotional response to a trooper's death while on duty, which she blamed on certain individuals in the Department. Conspicuously included among Sgt. Mys's supposed transgressions, however, were her sexual-harassment complaints against Sgt. Miller.
Lt. Schram also highlighted the fact that "she [Sgt. Mys] cannot stand to be around or see Detective Sgt. Miller and wanted to 'knock him on his ass.' " (Sgt. Mys phrased it differently, explaining that after Sgt. Miller began inappropriately touching her at work, she told Lt. Harris that "[i]f he [Sgt. Miller] touches me one more time, [I'm] going to knock him out.") Finally, Lt. Schram testified that "a hostile work environment existed at the Newaygo post and Sgt. Mys was responsible for it," strikingly similar words to those used by Cpt. Gorski when he requested Sgt. Mys's transfer.
The TRB was apparently persuaded by Lt. Schram's testimony. It rejected all of Sgt. Mys's preferred locations on the theory that she needed a "fresh start" outside of the Sixth District. But given that the TRB hearing was largely devoid of any discussion of Sgt. Mys's seniority, a reasonable jury could infer that the TRB rendered its decision based exclusively on her alleged "culpability." The acts that supposedly established Sgt. Mys's "culpability" included her efforts to engage in activity protected by Title VII. So even though Lt. Schram argued that Sgt. Mys was "culpable" in other ways, the jury would not have been unreasonable in finding that Cpt. Gorski's desire to punish Sgt. Mys for filing her sexual-harassment complaints against Sgt. Miller was the proximate cause of the TRB's decision to transfer her to Detroit. And that is the very definition of retaliation.
An unbroken chain therefore connects Cpt. Gorski to the TRB's placement decision. His retaliatory animus could reasonably be inferred from his email that initiated the transfer process, and could reasonably be found in Lt. Schram's testimony before the TRB, which Cpt. Gorski helped prepare. Accordingly, the jury's finding that Cpt. Gorski's retaliatory animus was the proximate cause of Sgt. Mys's transfer to Detroit was neither unreasonable nor "clearly against the weight of the evidence." Denhof , 494 F.3d at 543 ; see also Staub , 562 U.S. at 422, 131 S.Ct. 1186 ; Radvansky , 496 F.3d at 614.
C. Motion for a remittitur
As an alternative to the entry of judgment in its favor or the granting of a new trial, the Department seeks to remit the jury's damages award from $350,000 to no more than $150,000. We review a trial court's denial of a motion for a remittitur for abuse of discretion. Gregory v. Shelby County , 220 F.3d 433, 443 (6th Cir. 2000). "A trial court is within its discretion in remitting a verdict only when, after reviewing all evidence in the light most favorable to the awardee, it is convinced that *603 the verdict is clearly excessive, resulted from passion, bias, or prejudice; or is so excessive ... as to shock the judicial conscience...." Id.
Relying on the trial record, the district court calculated that the jury's award included $68,000 in backpay (Sgt. Mys's losses between the time of her retirement and the date on which the jury returned its verdict) and $72,000 in front pay (her losses between the date on which the jury returned its verdict and her intended date of retirement). It did so based on the difference between the $60,000 annual payout that Sgt. Mys receives from her pension and her $72,000 annual base salary, and her intention to work approximately another 12 years at the time that she retired.
The Department argues that these components of the award were erroneous because Sgt. Mys admitted at trial that her pension payments equal what she was receiving at Newaygo. Sgt. Mys's testimony on this topic was inconsistent. She said that she receives a $6,000 monthly pension payment, which, when multiplied by 12 months, equals her $72,000 annual base salary at the time of her retirement. But Sgt. Mys also made very clear that the difference between her salary at the time of her retirement and the pension that she receives is $12,000 annually. The district court did not abuse its discretion by crediting Sgt. Mys's clear statement of her annual losses.
When both the backpay and the front pay are subtracted from the jury's total award, the sum of $210,000 remains. The district court also calculated that the jury's award included compensation for her moving expenses, rent at the Ypsilanti apartment, the cost of gas for Sgt. Mys's frequent trips between Sand Lake and Ypsilanti, and the cost of purchasing credit toward early retirement. The Department argues that some or all of these costs should be offset by the extra money that Sgt. Mys earned by working overtime in Detroit.
We have no need to address the Department's offset argument, however, because even if the jury intended the entirety of the remaining $210,000 of its award to compensate Sgt. Mys for her pain and suffering, that component of the award was not "clearly excessive." See Gregory , 220 F.3d at 443. Sgt. Mys's trial testimony is replete with references to the emotional distress that she suffered from the Department's response to her sexual-harassment complaints, the insensitive way in which it notified her of her temporary assignment to the Rockford post, and the TRB's indifference to the circumstances that motivated her fight to remain in the Sixth District. She also testified that retiring early prevented her from achieving her dream of becoming the longest-tenured female employee of the Department.
This testimony provides a sufficient foundation for the jury's pain-and-suffering award. See Turic v. Holland Hosp., Inc. , 85 F.3d 1211, 1215 (6th Cir. 1996) (holding that a "plaintiff's own testimony, along with the circumstances of a particular case, can suffice" to justify an award of compensatory damages). Support for the award can also be found from the fact that Cpt. Gorski contacted the departmental psychologist to give him a "heads-up" before Sgt. Mys's temporary assignment to Rockford was formally announced, raising the inference that he anticipated the emotional distress that it would cause Sgt. Mys.
Moreover, the pain-and-suffering component of the jury's award is not excessive when compared with other awards approved by this court. See West v. Tyson Foods, Inc. , 374 Fed.Appx. 624, 641-43 (6th Cir. 2010) (approving $750,000 in compensatory *604 damages for a female employee's past and ongoing emotional distress from coworker sexual harassment and her constructive discharge); Knight v. Metro. Gov't of Nashville & Davidson County , 136 Fed.Appx. 755, 762 (6th Cir. 2005) (approving a $150,000 award for emotional damages sustained as a result of violations of the Americans with Disabilities Act).
The Department's final argument is that the total $350,000 award exceeds the applicable statutory cap on damages. Its argument is without merit. Although 42 U.S.C. § 1981a caps awards for "future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, and the amount of punitive damages" at $300,000 for employers of the Department's size, id. § 1981a(b)(3)(D), the statute specifically excludes backpay from the cap, id. § 1981(b)(2). In addition, the Supreme Court has held that front pay is exempt. Pollard v. E.I. du Pont de Nemours & Co. , 532 U.S. 843, 854, 121 S.Ct. 1946, 150 L.Ed.2d 62 (2001). The jury's award of $350,000 included $140,000 in both backpay and front pay, so the statutory cap is not implicated by its verdict.
In sum, record evidence supports each constituent part of the jury's award. The district court therefore did not abuse its discretion in denying the Department's motion for a remittitur.
III. CONCLUSION
For all of the reasons set forth above, we AFFIRM the judgment of the district court.